JM:RB
F.#2010R00609

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                    10-CR-609(S-1)(DLI)

MICHAEL METTER,
STEVEN MOSKOWITZ,
ANDREW TEPFER,
    also known as "Avi,"
SEYMOUR EISENBERG,
    also known as "Jimmy,"
GEORGE SPERANZA,
THOMAS CAVANAGH, and
FRANK NICOLOIS,

              Defendants.

- - - - - - - - - - - - - - - - - -X

THE GOVERNMENT'S OMNIBUS RESPONSE TO THE
DEFENDANTS' PRETRIAL MOTIONS

                        LORETTA E. LYNCH
                        UNITED STATES ATTORNEY
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201

ROGER BURLINGAME
Assistant U.S. Attorney
 (Of Counsel)

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................v

PRELIMINARY STATEMENT ...........................................1

STATEMENT OF FACTS ..............................................3

    I.   The Complaint ........................................3

    II.  The Computer Warrants ................................4

        A.   The Warrant for Metter's Home ...................4

        B.   The Warrant for Spongetech's Offices ............8

    III. The Indictments ......................................9

    IV.  The Email Warrant ...................................10

    V.   The Execution of the Warrants .......................12

    VI.  Removal of Attorney-Client Privileged Documents
        Prior to Review of Seized Electronic Information .....13

ARGUMENT .......................................................16

    I.   METTER AND TEPFER'S MOTION TO SUPPRESS SHOULD
        BE DENIED ...........................................16

        A.   The Execution of the Computer Warrants
            Was Lawful .....................................16

            1.   Legal Standard ............................17

            2.   There Is No Time Limit on the Government's
                Forensic Examination of the Imaged
                Hard Drives ...............................19

            3.   It Was Not Unreasonable to Delay the Search
                Until After the Attorney-Client Review .....24

            4.   "Blanket" Suppression Is
                Entirely Unwarranted ......................28

5.    Other Property Seized from Metter's
Home Was Within the Scope of the Warrant ... 32

B.    The Email Warrant Was Lawful ................... 33

1.    The Email Warrant Was Sufficiently
Particular ............................... 35

2.    The Email Warrant Was Not Overbroad ....... 40

3.    Evidence Obtained Under the Email Warrant
Falls Within the Good Faith Exception ...... 44

II.   THE MOTIONS BY METTER, CAVANAGH AND NICOLOIS TO
DISMISS THE COUNTS AGAINST THEM FOR LACK OF VENUE
SHOULD BE DENIED EXCEPT AS TO COUNT SEVEN, WHICH
SHOULD BE DISMISSED WITHOUT PREJUDICE ................ 48

A.    Legal Standard ................................ 48

B.    Counts One Through Six and Eight Through Ten
Properly Plead Venue .......................... 50

1.    Counts One Through Five ................... 50

2.    Count Six ................................. 51

3.    Counts Eight Through Ten .................. 52

C.    The Government Will Prove Facts at Trial
to Support Venue on All Counts ................. 58

1.    Counts One and Three ..................... 58

2.    Counts Two and Four ...................... 59

3.    Count Five ................................ 60

4.    Count Six ................................. 60

5.    Counts Eight, Nine and Ten ............... 60

D.    If This Court Were to Find Venue Lacking for
Any Count, It Should Only Dismiss that Count .... 61

E.    Count Seven Should Be Dismissed Without
Prejudice ..................................... 62

III.  CAVANAGH AND NICOLOIS'S MOTION TO DISMISS COUNTS
      SIX AND SEVEN FOR VAGUENESS SHOULD BE DENIED ........ 64

      B.   Count Six Is Not Impermissibly Vague ............ 66

      C.   Count Seven Is Not Impermissibly Vague ......... 72

IV.  EISENBERG'S MOTION TO SEVER SHOULD BE DENIED ........ 75

CONCLUSION................................................... 85

TABLE OF AUTHORITIES

Page

CASES

Andresen v. Maryland,
  427 U.S. 463 (1976)...................................25, 35, 37

Bloom v. Illinois,
  391 U.S. 194 (1968)..........................................63

Bruton v. United States,
  391 U.S. 123 (1968)..........................................75

Coolidge v. New Hampshire,
  403 U.S. 443 (1971)......................................31, 34

Dalia v. United States,
  441 U.S. 238 (1979)..........................................17

Illinois v. Krull,
  480 U.S. 340 (1987)..........................................45

Leman v. Krentler-Arnold Hinge Last Co.,
  284 U.S. 448 (1932)..........................................63

Marron v. United States,
  275 U.S. 192 (1927)..........................................39

Marvin v. United States,
  732 F.2d 669 (9th Cir. 1982).................................31

Massachusetts v. Sheppard,
  468 U.S. 981 (1984)..........................................45

Rakas v. Illinois,
  439 U.S. 128 (1978)..........................................17

Richardson v. Marsh,
  481 U.S. 200 (1987)..........................................75

Russell v. United States,
  369 U.S. 749 (1962)..........................................66

SST Global Technology, LLC v. Chapman,
  270 F.Supp.2d 444 (S.D.N.Y. 2003)............................59

United States v. Alfonso,
  143 F.3d 772 (2d Cir. 1998)...............................50, 65

United States v. Basciano,
  No. 05-CR-060 (NGG), 2007 WL 3124662
  (E.D.N.Y. Oct. 23, 2007)....................................83

United States v. Beech-Nut Nutrition Corp.,
  871 F.2d 1181 (2d Cir. 1989)................................53

United States v. Bellomo,
  263 F.Supp.2d 561 (E.D.N.Y. 2003).......................49, 50

United States v. Bellomo,
  954 F. Supp. 630 (S.D.N.Y. 1997)............................79

United States v. Brennan,
  183 F.3d 189 (2d Cir. 1999).................................48

United States v. Bronson,
  No. 05-CR-714, 2007 WL 2455138
  (E.D.N.Y. Aug. 23, 2007)................................49, 50

United States v. Brooks,
  427 F.3d 1246 (10th Cir. 2005)..............................18

United States v. Buck,
  813 F.2d 588 (2d Cir. 1987).................................37

United States v. Burns,
  No. 07 CR 556, 2008 WL 4542990
  (N.D. Ill. Apr. 29, 2008)...............................20, 21

United States v. Cabrales,
  524 U.S. 1 (1998)...........................................53

United States v. Cardascia,
  951 F.2d 474 (2d Cir. 1992).............................77, 82

United States v. Carr,
  582 F.2d 242 (2d Cir. 1978).................................65

United States v. Carson,
  702 F.2d 351 (2d. Cir 1983).................................77

United States v. Casamento,
  887 F.2d 1141 (2d Cir. 1989)............................82, 84

United States v. Cioffi,
  668 F.Supp.2d 385 (E.D.N.Y. 2009).......................passim

United States v. Clark,
  No. 87-CR-49 1987 WL 13273, (S.D.N.Y. June 30, 1987).........55

United States v. Cohan,
  628 F.Supp.2d 355 (E.D.N.Y. 2009).......................passim

United States v. Comprehensive Drug Testing, Inc.,
  579 F.3d 989 (9th Cir. 2009) (en banc).......................27

United States v. Copeland,
  336 F.Supp.2d 223 (E.D.N.Y. 2004)............................83

United States v. Debbi,
  244 F.Supp.2d 235 (S.D.N.Y. 2003)........................31, 32

United States v. Diapulse Corp.,
  365 F. Supp. 935 (E.D.N.Y. 1973)........................62, 63

United States v. Diaz,
  176 F.3d 52 (2d Cir. 1999)...................................81

United States v. Dupree,
  No. 10-CR-627 (KAM), 2011 WL 1004824
  (E.D.N.Y. Mar. 18, 2011)............................35, 36, 38

United States v. Ehrlichman,
  546 F.2d 910 (D.C. Cir. 1976)................................82

United States v. Eisenberg,
  773 F. Supp. 662 (E.D.N.Y. 1991)............................77

United States v. Feyrer,
  333 F.3d 110 (2d Cir. 2003)..................................78

United States v. Foster,
  100 F.3d 846 (10th Cir. 1996)................................30

United States v. Fumo,
  No. 06-319, 2007 WL 3232112 (E.D. Pa. Oct. 30, 2007).....26, 41

United States v. Galestro,
  No. 06-CR-285 (ARR), 2008 WL 2783360
  (E.D.N.Y. July 15, 2008).......................65, 66, 67, 70

United States v. George,
   975 F.2d 72 (2d Cir. 1984)...........................35, 37, 39

United States v. Gerber,
   994 F.2d 1556 (11th Cir. 1993)...............................19

United States v. Girard,
   601 F.2d 69 (2d Cir. 1979)...................................76

United States v. Goldberg,
   756 F.2d 949 (2d Cir. 1985)..................................49

United States v. Gorrell,
   360 F.Supp.2d 48 (D.D.C. 2004)...............................21

United States v. Graziano,
   558 F.Supp.2d 304 (E.D.N.Y. 2008)........................passim

United States v. Habershaw,
   No. CR. 01-10195-PBS, 2002 WL 33003434
   (D. Mass. May 13, 2002)......................................20

United States v. Harwood,
   998 F.2d 91 (2d Cir. 1993)...................................81

United States v. Haynes,
   16 F.3d 29 (2d Cir. 1994)....................................81

United States v. Heredia,
   No. 02-CR-1246, 2003 WL 21524008 (S.D.N.Y. Jul. 3, 2003).....51

United States v. Hernandez,
   183 F.Supp.2d 468 (D.P.R. 2002)..............................20

United States v. Hill,
   459 F.3d 966 (9th Cir. 2006)..............................18, 34

United States v. Kahale,
   No. 09-CR-159 (KAM), 2010 WL 456860 (E.D.N.Y. Feb 3, 2010)...82

United States v. Labate,
   No. S100CR.632, 2001 WL 533714
   (S.D.N.Y. May 18, 2001)...............................68, 69, 74

United States v. Lamb,
   945 F. Supp. 441 (N.D.N.Y. 1996).............................19

United States v. Lanza,
  790 F.2d 1015 (2d Cir. 1986)..................................76

United States v. Leon,
  468 U.S. 897 (1984).................................44, 45, 46

United States v. Liu,
  239 F.3d 138 (2d Cir. 2000).........................29, 30, 31

United States v. Mahaffy,
  446 F.Supp.2d 115 (E.D.N.Y. 2006)...........................81

United States v. Mahaffy,
  No. 05-CR-613, 2006 WL 2224518 (E.D.N.Y. Aug. 2, 2006).......49

United States v. Maisonet,
  No. S3 97 CR. 0817 (DC), 1998 WL 355414
  (S.D.N.Y. Jul. 1, 1998)....................................80

United States v. Manfredi,
  789 F. Supp. 961 (D. Ind. 1992).....................54, 56, 57

United States v. Matlock,
  415 U.S. 164 (1974)........................................17

United States v. Moody,
  660 F.Supp.2d 340 (D. Conn. 2009)..........................83

United States v. Moore,
  968 F.2d 216 (2d Cir. 1992)................................45

United States v. Mutschelknaus,
  564 F.Supp.2d 1072 (D.N.D. 2008)...........................20

United States v. Naranjo,
  14 F.3d 145 (2d Cir. 1994).................................59

United States v. Nerlinger,
  862 F.2d 967 (2d Cir. 1988)............................76, 77

United States v. Novak,
  443 F.3d 150 (2d Cir. 2006)............................51, 62

United States v. Peterson,
  357 F.Supp.2d 748 (S.D.N.Y. 2005)..........................49

United States v. Pirro,
  212 F.3d 86 (2d Cir. 2000)...................................68

United States v. Potamitis,
  564 F. Supp. 1484 (S.D.N.Y. 1983)...........................82

United States v. Reed,
  773 F.2d 477 (2d Cir. 1985)....................49, 53, 57, 58

United States v. Regan,
  706 F. Supp. 1102 (S.D.N.Y. 1989).......................36, 38

United States v. Riley,
  906 F.2d 841 (2d Cir. 1990)............................25, 41

United States v. Rosa,
  626 F.3d 56 (2d Cir. 2010) ..................................37

United States v. Royer,
  549 F.3d 886 (2d Cir. 2008).................................62

United States v. Rucker,
  32 F.Supp.2d 545 (E.D.N.Y. 1999)............................76

United States v. Salameh,
  152 F.3d 88 (2d Cir. 1998).............................45, 81

United States v. Savoy,
  38 F.Supp.2d 406 (D. Md. 1998).........................52, 54

United States v. Scarfo,
  180 F.Supp.2d 572 (D.N.J. 2001).......................27, 41

United States v. Schandl,
  947 F.2d 462 (11th Cir. 1991)...............................19

United States v. Schlegel,
  No. 06-CR-0550 (JS), 2009 WL 3837305
  (E.D.N.Y. Nov. 16, 2009)...................................82

United States v. Smith,
  641 F.3d 1200 (10th Cir. 2011) .........................55, 56

United States v. Squillacote,
  221 F.3d 542 (4th Cir. 2000)...........................29, 44

United States v. Stavroulakis,
  952 F.2d 686 (2d Cir. 1992)...................................65

United States v. Svoboda,
  347 F.3d 471 (2d Cir. 2003).........................48, 53, 59

United States v. Syphers,
  426 F.3d 461 (1st Cir. 2005).......................19, 20, 21

United States v. Szur,
  No. S5 97 CR 108 (JGK), 1998 WL 132942
  (S.D.N.Y. Mar. 20, 1998)................................50, 51

United States v. Tamura,
  694 F.2d 591 (9th Cir. 1982)............................22, 23

United States v. Tanner,
  471 F.2d 128 (7th Cir. 1972)...............................62

United States v. Tramunti,
  513 F.2d 1087 (2d Cir. 1975)............................65, 67

United States v. Triumph Capital Group, Inc.,
  211 F.R.D. 31 (D. Conn. 2002)...........................20, 35

United States v. Tutino,
  883 F.3d 1125 (2d Cir. 1989)...............................72

United States v. Tzolov,
  642 F.3d 314 (2d Cir. 2011)................................62

United States v. Upham,
  168 F.3d 532 (1st Cir. 1999)...............................18

United States v. Urso,
  369 F.Supp.2d 254 (E.D.N.Y. 2005)...............65, 67, 68, 70

United States v. Ventresca,
  380 U.S. 102 (1965)....................................35, 39

United States v. Vilar,
  No. S305CR621KMK, 2007 WL 1075041
  (S.D.N.Y. Apr. 4, 2007)................................passim

United States v. Villegas,
  899 F.2d 1324 (2d Cir. 1990).......................82, 83, 84

United States v. Walsh,
  194 F.3d 37 (2d Cir. 1999).......................64, 65, 66, 70

Waffenschmidt v. Mackay,
  763 F.2d 711 (5th Cir. 1985)...............................62

Zafiro v. United States,
  506 U.S. 534 (1993)....................................77, 81


## STATUTES

18 U.S.C. § 2703(a) .........................................49

18 U.S.C. § 2703(c)(1)(a) ...................................49

18 U.S.C. § 3237(a) .........................................56

Fed. R. Crim. P. 16 .........................................29

Fed. R. Crim. P. 18 .........................................56

Fed. R. Crim. P. 41(e)(2)(A) ................................27

Fed. R. Crim. P. 41(e)(2)(B) ............................25, 27

Fed. R. Crim. P. 7(c) .......................................72

Fed. R. Crim. P. 8(c) .......................................84


## REGULATIONS

31 C.F.R. § 103.11(gg) ......................................75

## CONSTITUTIONAL PROVISIONS

U.S. Const. Amend. IV. ......................................40

U.S. Const. Amend. VI ...................................29, 56

U.S. Const. Art. III, § 2, cl. 3 ............................56

<u>PRELIMINARY STATEMENT</u>

On October 14, 2010, a grand jury sitting in the Eastern District of New York returned a ten-count superseding indictment against Michael Metter, Steven Moskowitz, Andrew Tepfer, Seymour Eisenberg, George Speranza, Thomas Cavanagh and Frank Nicolois (the "defendants").  The charges arose from the defendants' participation in a fraudulent scheme to (a) publicly report false and materially overstated sales figures to create artificial demand for, and increase the share price and trading volume of, the common stock of Spongetech Delivery Systems, Inc. ("Spongetech"); (b) issue restricted Spongetech common stock to entities controlled by Spongetech; (c) unrestrict the stock; (d) sell the unrestricted stock; and (e) personally profit from the stock sales.

Defendants Metter, Tepfer, Eisenberg, Cavanagh and Nicolois have made the following pre-trial motions:

- Metter has moved to dismiss the charges against him on the ground that venue is lacking;

- Metter and Tepfer have moved to suppress certain property obtained under the authority of three search warrants: two warrants authorizing the seizure of computers and other material from Spongetech's offices and Metter's home, and one authorizing the seizure of Metter's personal email account from an Internet Service Provider;

- Eisenberg has moved to sever his trial from that of the other defendants;

1

- Cavanagh and Nicolois have moved to dismiss the charges against them on the grounds that venue is lacking and that the superseding indictment is impermissibly vague; and

- Cavanagh and Nicolois have moved to sever their trials from those of the other defendants.[1]

For the reasons set forth below, as well as those set forth in the government's March 11, 2011 response to Cavanagh's and Nicolois's severance motions, the defendants' motions should be denied, except that Count Seven should be dismissed without prejudice because venue is lacking in this District.

---

[1]    Cavanagh's and Nicolois's severance motions have already been briefed.  (ECF Doc. Nos. 97, 98, 103, 109).

STATEMENT OF FACTS

I.   The Complaint

On May 3, 2010, FBI Special Agent Thomas McGuire submitted a complaint and affidavit (the "Complaint") in support of arrest warrants for defendants Michael Metter and Steven Moskowitz.  The Complaint detailed the FBI's investigation of Metter and Moskowitz, their roles in the operations of Spongetech, their participation in a securities fraud scheme related to Spongetech, and their attempts to obstruct justice to cover up that scheme.  (Complaint at 1-2) ("Compl.").

Among others, the Complaint set forth the following facts.  Metter served as Spongetech's Chief Executive Officer ("CEO") and president, and as the president of and a significant shareholder in another company, RM Enterprises International Ltd. ("RM Enterprises").  (Id. ¶ 6).  Moskowitz was Spongetech's Chief Operating Officer ("COO"), Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO"), treasurer and secretary.  (Id. ¶ 7).  He was also a major shareholder in RM Enterprises.  (Id. ¶ 3).

To increase the value of its stock, between 2007 and 2009, Spongetech publicly reported that it had received numerous large purchase orders from five customers that did not exist. (Id. ¶ 9).  In some cases, Spongetech reported that sales to these nonexistent customers made up as much as 99% of its

3

revenue.  (Id.)  The public statements concerning the fake sales took the form of both press releases and SEC filings, and were authorized and signed by Metter and Moskowitz.  (Id. ¶¶ 10-31).  After the SEC launched a formal investigation of Spongetech beginning in September 2009, Metter, Moskowitz and others, including Speranza, tried to conceal their scheme by establishing false websites and virtual offices for the nonexistent customers and by forging purchase orders purportedly received from them.[2]  (Id. ¶¶ 33-50).

Magistrate Judge Ramon E. Reyes of the Eastern District of New York authorized the arrests of Metter and Moskowitz on May 3, 2010.

II.  The Computer Warrants

A.  The Warrant for Metter's Home

On May 4, 2010, Special Agent McGuire also applied for a warrant to search Metter's home in Greenwich, Connecticut. (Metter Ex. 3 at 1).  A 36-page affidavit (the "McGuire Affidavit") in support of the application detailed McGuire's extensive experience in business and securities fraud investigations as well as and his extensive knowledge of and experience with searches involving computer data.  (Id. ¶¶ 1, 52-57).

---

[2]   On May 6, 2011, Speranza pled guilty to perjury in connection with testimony given to the SEC.  (ECF Doc. No. 119).

The McGuire Affidavit incorporated the Complaint by reference and set forth the same facts.  (Id. ¶ 2). Additionally, the McGuire Affidavit detailed Spongetech's issuance of fraudulent opinion letters to stock transfer agents in order to unrestrict shares of Spongetech stock so that they could be traded on the open market.  (Id. ¶¶ 8-19).  The opinion letters fraudulently supported unrestricting shares that had not been held for the legally required period, or otherwise failed to meet the legal requirements to become unrestricted.  (Id. ¶¶ 4-6, 8, 18-19).  In addition, some of the opinion letters had not in fact been written by the attorney whose name appeared on them; others were purportedly written and signed by an individual, David Bomart, who did not exist;[3] and others were based on knowingly false statements made by another attorney hired by Spongetech.  (Id. ¶¶ 4-6, 8-16, 17-18).

Typically, the newly unrestricted shares were issued to RM Enterprises, which then transferred them to more than 200 beneficiaries identified in the McGuire Affidavit.  (Id. ¶ 21). The McGuire Affidavit also explained that Asset Management Enterprises, Inc. ("Asset Management") a company controlled by Spongetech, acted as a "conduit" for the sale of Spongetech stock by RM Enterprises.  (Id. ¶¶ 27-33).  Defendant Eisenberg

---

[3]     Metter and Moskowitz testified under oath to the SEC that Bomart was a real person.  (Metter Ex. 3 ¶ 20).

was the president of Asset Management.[4]  (Id. ¶ 27).  Other companies that shared the same address as RM Enterprises and/or were controlled by Spongetech employees also received unrestricted shares.  (Id. ¶¶ 34-44).  Defendant Tepfer was the president of one of these entities, Wesley Equities, Inc. ("Wesley Equities"), and was the CFO of another entity, AIT Capital Inc. ("AIT Capital").  (Id. ¶ 35-36).

In addition, the investigation uncovered evidence of "structuring" — depositing multiple checks of less than $10,000 in violation of anti-money laundering laws.  (Id. ¶¶ 22-26). The McGuire Affidavit stated that Moskowitz, as well as defendants Cavanagh[5] and Nicolois, participated in the structuring.  (Id. ¶ 22).  It revealed specific details of the structuring, noting that 235 checks under $10,000 were cashed, and that "[o]n two separate occasions, February 20, 2008 and March 18, 2008," Cavanagh, Nicolois and another Spongetech employee named Yehudah Lieberman "cashed multiple checks on the same day that, when added together, would have been in excess of $10,000."  (Id. ¶ 23).

---

[4]    The McGuire Affidavit referred to Eisenberg by an alias, "Jimmy Eisenberg."  (Id. ¶ 27).

[5]    The McGuire Affidavit misspelled Cavanagh's name as "Thomas Cavanaugh."  (Id. ¶ 22).

The McGuire Affidavit stated that Metter used computers located at his home in connection with Spongetech's business; that all emails sent to Metter's business email address were forwarded to his personal email account, which could be accessed from any computer connected to the Internet; and that agents had recovered from Metter's household trash a number of computer-generated documents related to the Spongetech scheme. (Id. ¶¶ 48-51). The McGuire Affidavit went on to describe the difficulties that searching computer systems can involve:

> There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. . . .
>
> . . . Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. . . .
>
> . . . The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of a premises. . . .
>
> . . . Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. . . . Therefore, a substantial amount of time is necessary to

> extract and sort through data that is
> concealed or encrypted to determine whether
> it is evidence, contraband, or
> instrumentalities of a crime.

(Id. ¶¶ 53-56).  The McGuire Affidavit thus requested permission to "search, copy, image and seize the computer hardware" and to "conduct an off-site search of the image or hardware for the evidence fruits and instrumentalities" of violations of specified criminal statutes.  (Id. ¶ 58).

Judge Warren W. Eginton of the District of Connecticut issued a warrant for the search of Metter's home and the seizure of certain documents, a list of which was attached as Exhibit A to both the McGuire Affidavit and the warrant.  (Metter Ex. 4). The warrant's authorization extended to documents stored on computers.  (Id., Attachment A at 5).

B.    The Warrant for Spongetech's Offices

Also on May 4, 2010, IRS Special Agent John Carrano applied for a warrant to search Spongetech's and RM Enterprises' offices in Manhattan.  Carrano's 37-page affidavit (the "Carrano Affidavit") in support of the warrant detailed Carrano's substantial experience in fraud investigations, including the execution of search warrants.  (Metter Ex. 5 ¶ 1).

The Carrano Affidavit incorporated by reference the Complaint (id. ¶ 2) and described the same details of the investigation set forth in the body of the McGuire Affidavit.

(Id. ¶¶ 5-48).  It further stated that Spongetech and RM Enterprises employees had used computers at the company offices in the course of their scheme.  (Id. ¶¶ 51, 53).  Finally, after describing — as in the McGuire Affidavit — the complexity of computer searches, it requested permission to "search, copy, image and seize the computer hardware" and perform an off-site search for "evidence, fruits, and instrumentalities" of violations of specified criminal statutes.  (Id. ¶ 60).

Magistrate Judge Kevin Nathaniel Fox of the Southern District of New York issued a warrant for the search of the two offices and the seizure of certain documents, a list of which was attached as Exhibit A to both the Carrano Affidavit and the warrant.  (Metter Ex. 6).

III. The Indictments

On August 6, 2010, the Grand Jury returned a six-count indictment charging Metter and Moskowitz with conspiring to commit securities fraud, obstruction of justice and money laundering, as well as substantive counts of securities fraud and obstruction of justice.  (Indictment ¶¶ 17-25).  The indictment also charged Metter and Moskowitz with one count each of perjury for lying to the SEC during its investigation of Spongetech.  (Id. ¶¶ 17-26).

On October 14, 2010, the grand jury returned a ten-count superseding indictment, modifying the charges against

9

Metter and Moskowitz, and adding charges against Tepfer,
Eisenberg, Cavanagh, Nicolois and Speranza.  The superseding
indictment began with an introduction that described the
fraudulent scheme in detail.  (Superseding Indictment ¶¶ 1-22)
("Ind.").  Count One charged Metter, Moskowitz, Tepfer and
Eisenberg with conspiracy to commit securities fraud (id. ¶¶ 23-
25); Count Two charged Metter, Moskowitz and Speranza with
conspiracy to commit obstruction of justice (id. ¶¶ 26-28);
Count Three charged Metter, Moskowitz, Tepfer and Eisenberg with
securities fraud (id. ¶¶ 29-30); Count Four charged Metter,
Moskowitz and Speranza with obstruction of justice (id. ¶¶ 31-
32); Count Five charged Metter, Moskowitz, Tepfer and Eisenberg
with conspiracy to commit money laundering (id. ¶¶ 33-34);
Counts Six and Seven charged Cavanagh and Nicolois with
structuring (id. ¶¶ 35-41) and contempt of court (id. ¶¶ 42-43);
Count Eight charged Moskowitz with perjury (id. ¶¶ 44-45); Count
Nine charged Metter with perjury (id. ¶¶ 46-47); and Count Ten
charged Speranza with perjury.  (Id. ¶¶ 48-49).  The superseding
indictment also included forfeiture allegations as to Counts
One, Three, Five and Six.  (Id. ¶¶ 50-55).

IV.  The Email Warrant

On November 1, 2010, Special Agent McGuire swore out
an affidavit for a third search warrant, to seize the personal
email accounts of Metter, Cavanagh, Nicolois, Speranza and an

account purportedly belonging to David Bomart, the fictional
attorney.[6]  The 60-page affidavit (the "Email Affidavit")
described the investigation and the Spongetech scheme and
detailed the manner in which the five email accounts had been
used in connection with the scheme.  (Metter Ex. 8 ¶¶ 118-128).
It asked for authority to seize from the respective Internet
Service Providers ("ISPs") "all images and all text messages"
stored in the five email accounts, explaining:

> First, because voluminous amounts of
> information can be stored in a computer
> account, and because it might be stored in a
> deceptive fashion or with deceptive file
> names to conceal criminal activity, the
> searching authorities must carefully open
> and examine all the stored data to determine
> which of the various files are evidence,
> fruits, or instrumentalities of the crime. .
> . . Second, this sorting process must be
> done in a controlled environment, due to the
> extensive array of computer hardware or
> software that might be necessary . . . .

(Id. ¶ 130).

Magistrate Judge Andrew L. Carter of the Eastern
District of New York issued a warrant for the seizure of files
relating to Metter's email account.  Attachment A-1 to both the
Email Affidavit and the warrant specified the file types

---

[6]     As part of the fraudulent scheme, Moskowitz established
this account and used it to send certain emails — purportedly
from the fictional attorney — to a stock transfer agent, in the
course of attempting to remove the restrictive legends from
Spongetech shares.  (Metter Ex. 8 ¶ 128).

authorized to be seized. (Metter Ex. 9).[7]  The warrant also
attached the Email Affidavit.

V.    The Execution of the Warrants

        In the process of executing the two warrants
authorizing the seizure of computers from Spongetech's offices
and Metter's home, agents made copies — or "images" — of seized
computer hard-drives,[8] and promptly returned the physical
materials, planning to subsequently search the images for
evidence of the alleged crimes.[9]  The government also obtained
from the ISPs the email account files identified in the Email

---

[7]  Exhibit 9 attached to Metter's motion to suppress consists
of the warrant authorizing the seizure of only two of the five
accounts: Metter's and Speranza's.  Those addresses — but not
the others — were both hosted by AOL, Inc., so their seizure was
authorized by a single warrant.  (Metter Ex. 9).  Seizure of the
other accounts was authorized by other warrants.

[8]  A hard-drive image is a copy of a computer's hard drive
that "duplicates every bit and byte on the target drive
including all files, the slack space, Master File Table, and
metadata in exactly the order they appear on the original."
United States v. Vilar, No. S305CR621KMK, 2007 WL 1075041, at
*35 n.22 (S.D.N.Y. Apr. 4, 2007) (quoting Orin S. Kerr, Searches
and Seizures in a Digital World, 119 Harv L. Rev. 531 (2005)).
Searching an image is exactly like searching the target computer
itself, but can be done off-site.

[9]  In total, the government seized 68 hard drives: four from
Metter's home, 61 from the Spongetech offices, and three from
Speranza's apartment in Brooklyn.  (Metter Ex. 7).  (Magistrate
Judge Reyes also issued a warrant authorizing the search of
Speranza's apartment on May 4, 2010.)  The government also
seized 67 boxes of physical documents from the Spongetech
offices; copies of those documents have been provided to defense
counsel.  (ECF Doc. No. 87 at 1).  From Metter's home, agents
also seized certain physical documents and roughly $27,000 in
cash.  (Metter Ex. 7 at 15-23).

Affidavit, with the intention of searching through them in much
the same way as the hard-drive images.  Agents have not yet
performed these searches because the government and defense
counsel remain engaged in isolating and removing attorney-client
privileged documents from the imaged files — a critical first
step before an actual search can occur.

VI.   Removal of Attorney-Client Privileged Documents Prior to
      Review of Seized Electronic Information

        At a status conference on November 22, 2010, the
government noted that prior to its analysis of the seized hard
drives and emails, it would require defense counsel to provide a
list of search terms that the government could use to filter out
attorney-client privileged documents.  (Metter Ex. 10 at 6).  At
another conference on February 4, 2011, the government stated
that it had asked defense counsel, in a letter dated December
27, 2010, for the names of attorneys representing the defendants
so that agents could begin filtering correspondence with those
attorneys.  (Metter Ex. 11 at 18).  At that time, defense
counsel had not responded to the government's request.  (Id. at
20).

        At the February 4 conference, the government also
reiterated its plan — originally announced to the Court in a
letter dated January 25, 2011 (ECF Doc. No. 87 at 1-2) — to
provide copies of seized hard-drive images to all defendants in

order to fulfill its discovery obligations.  (Metter Ex. 11 at 23-24).  Counsel for Metter objected, concerned that privileged or personal information might be revealed to Metter's co-defendants.  (Metter Ex. 11 at 25-29).  The Court then ordered the government to provide the defense with an inventory of seized materials, so each attorney could identify the computers used by his or her client as well as any personal or privileged documents on the images associated with those computers.[10]  (Id. at 31-33).

     After that conference, the government provided the inventory of the seized materials.  (See Metter Ex. 7).  In a letter to the court filed on February 28, 2011, the government reiterated that (i) a filter team would remove privileged documents from the hard-drive images, and (ii) the government would make available the seized computers so that defense attorneys could indicate "privileged or irrelevant material on those computers that those attorneys believe should not be

---

[10]    During the discussion of this plan, counsel for Metter suggested that based on the inventory of seized documents, "It may well be that we're going to take the position that some of the seized material was well outside the scope of the warrant." (Metter Ex. 11 at 36).  In response, the Court made clear that such concerns would best be "deal[t] with when we deal with the admissibility issues."  (Id. at 37).  Later, in response to similar concerns raised by counsel for Tepfer, the Court reiterated: "[W]hether or not [private] statements get used at trial is a whole different issue.  That's motions in limine. And we're not anywhere near that yet."  (Id. at 39).

produced to the rest of the defendants." (ECF Doc. No. 101 at 2). In response, Metter argued that the filter team should conduct its review before the government made images of the seized computers available. He also challenged the government's plan to make the images available before determining which documents fell within the scope of the warrants. (ECF Doc. No. 103 at 3).

In response to the government's request for attorneys' names, the defense provided a lengthy list, which the government challenged as insufficiently particular. At a conference on April 8, 2011, the Court directed the defense to provide "particularized information, including email addresses of attorneys." (ECF Doc. No. 110). On April 22, 2011, defense counsel finally provided such a list, and the government began the process of identifying privileged documents. (ECF Doc. No. 141).

ARGUMENT

I.   METTER AND TEPFER'S MOTION TO SUPPRESS SHOULD BE DENIED

Metter argues that evidence obtained from computers seized from Spongetech's offices and his home, as well as evidence obtained from his personal email account, should be suppressed.  He argues that the government's execution of the warrants authorizing the seizure of the computers (the "Computer Warrants") was unlawful, and that the warrant authorizing the seizure of his email account (the "Email Warrant") was itself facially invalid.  (Metter and Tepfer's Memorandum of Law at 1-2, 2-3) ("Metter & Tepfer Mem.").  Tepfer joins Metter's motion as to the computers seized from Spongetech's offices.  (Id. at 1).  The Court should deny the defendants' motion.

A.   The Execution of the Computer Warrants Was Lawful

Metter[11] states that the government "seiz[ed] more than 60 hard drives and then simply [kept] them, without regard for their contents."  (Metter & Tepfer Mem. at 2).  This claim is misleading.  In fact, the government — consistent with established practice — imaged the hard drives and promptly returned "seized" physical materials.  Nonetheless, Metter argues that the government's failure promptly to search the hard

---

[11]   This section of this memorandum refers to Metter alone as the movant, both for convenience and because Tepfer joins only one part of Metter's motion, the memorandum in support of which was written by counsel for Metter.

drive images amounted to "ignor[ing] the scope of the warrant" (Metter & Tepfer Mem. at 12), and that the government's "seizure of materials that are beyond the scope of the warrant, and its retention of those items, requires suppression."  (Id. at 9). Metter is wrong.  The execution of the warrants was reasonable under the Fourth Amendment, and the Court should reject Metter's claims.

     1.   Legal Standard

"The proponent of a motion to suppress has the burden of establishing that his . . . Fourth Amendment rights have been violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978).  A defendant must prove such a violation by a preponderance of the evidence.  See United States v. Matlock, 415 U.S. 164, 178 n.14 (1974).

"[T]he manner of the execution of warrant" in computer searches is "subject to judicial review under a 'reasonableness' standard."  United States v. Graziano, 558 F.Supp.2d 304, 316 (E.D.N.Y. 2008).  While this standard allows for judicial oversight, "it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search." United States v. Vilar, No. S305CR621KMK, 2007 WL 1075041, at *37 (S.D.N.Y. Apr. 4, 2007) (quoting Dalia v. United States, 441 U.S. 238, 257 (1979)).  Deference is appropriate because executing agents

often do not know until after a warrant has been issued the most
effective way to locate the materials they seek.  See Vilar,
2007 WL 1075041, at *38 ("[S]earching a computer for evidence of
a crime can be as much an art as a science.") (quoting United
States v. Brooks, 427 F.3d 1246, 1252 (10th Cir. 2005)).  A
reasonableness standard allows courts to evaluate searches after
they occur, when the circumstances are better established.  See
id. (arguing that "courts are ill-equipped" to "tell[]
investigators how to conduct a lawful investigation" before it
begins) (citing United States v. Hill, 459 F.3d 966, 978 (9th
Cir. 2006)).

        Searches involving computer files differ from physical
searches because computers must be analyzed using equipment that
cannot be brought to the search site.  (Metter Ex. 3 ¶ 53).
Computer searches also require painstaking procedures to extract
evidence from the massive amounts of data that computers can
hold.  (Id. ¶ 54-55).  Because of these limitations, executing
agents may seize an entire computer and perform a subsequent
off-site search.  See Fed. R. Crim. P. 41(e)(2)(B) ("A warrant .
. . may authorize the seizure of electronic storage media or the
seizure or copying of electronically stored information.");
United States v. Upham, 168 F.3d 532, 535 (1st Cir. 1999)
(upholding "seizure and subsequent off-premises search of the
computer and all available disks" as "about the narrowest

18

definable search and seizure reasonably likely" to locate evidence); United States v. Schandl, 947 F.2d 462, 465-66 (11th Cir. 1991) (noting that an on-site search "might have been far more disruptive" than agents' off-site search); United States v. Lamb, 945 F. Supp. 441, 462 (N.D.N.Y. 1996) ("[I]f some of the [] files are stored on the internal hard drive of the computer, removing the computer to an FBI office or lab is likely to be the only practical way of examining its contents.").

      2.   There Is No Time Limit on the Government's
           Forensic Examination of the Imaged Hard Drives

Metter cites the interval since the government seized the hard drives — and the fact that investigators have not yet searched the imaged files for evidence — to argue that the execution of the warrants was unreasonable because "there exists no authority for the proposition that the delay in this case comports with a 'reasonableness' standard." (Metter & Tepfer Mem. at 15). Metter is wrong.

"The Fourth Amendment itself 'contains no requirements about when the search or seizure is to occur or the duration.'" United States v. Syphers, 426 F.3d 461, 469 (1st Cir. 2005) (quoting United States v. Gerber, 994 F.2d 1556, 1559-60 (11th Cir. 1993)). Instead, the Federal Rules of Criminal Procedure impose a time limit on the execution of a warrant: It must take place no longer than 14 days after the warrant issues. Fed. R.

Crim. P. 41(e)(2)(A).  However, where computer searches are
concerned, this time limit only "refers to the seizure or on-
site copying of the media or information, and not to any later
off-site copying or review."  Fed. R. Crim. P. 41(e)(2)(B).
Thus, the Rules explicitly decline to limit the amount of time
that agents may take to review computer files.  See also United
States v. Habershaw, No. CR. 01-10195-PBS, 2002 WL 33003434, at
*8 (D. Mass. May 13, 2002) ("Further forensic analysis of the
seized hard drive image does not constitute a second execution
of the warrant.")

       The timeframe in which a forensic analysis takes place
is subject to review for reasonableness, but there is "no upper
limit on reasonableness."  United States v. Burns, No. 07 CR
556, 2008 WL 4542990, at *8 (N.D. Ill. Apr. 29, 2008); see also
United States v. Mutschelknaus, 564 F.Supp.2d 1072, 1077 (D.N.D.
2008) ("Any subsequent search [of seized computers] only needs
to be completed within a reasonable time."); United States v.
Hernandez, 183 F.Supp.2d 468, 480 (D.P.R. 2002) (calling an
extended post-seizure search of the contents of floppy disks
"perfectly reasonable").  Courts have permitted significant
delays in the search of seized computer hard drives because of
the complexity of such searches.  See Syphers, 426 F.3d at 469
(collecting cases); United States v. Triumph Capital Group,
Inc., 211 F.R.D. 31, 66 (D. Conn. 2002) ("[C]omputer searches

20

are not, and cannot be subject to any rigid time limit because
they may involve much more information than an ordinary document
search, more preparation and a greater degree of care in their
execution."). Even when, unlike in this case, physical hard
drives are seized and then kept — rather than imaged and
returned — courts have allowed the government a significant
amount of time to search them for evidence. See, e.g., Syphers,
426 F.3d at 469 (upholding five-month period during which the
government had physical custody of the seized computer); Burns,
2008 WL 4542990, at *8-9 (upholding ten-month period during
which the government had physical custody of the seized
computer); United States v. Gorrell, 360 F.Supp.2d 48, 55 n.5
(D.D.C. 2004) (same).

     Here, the majority of computers were imaged on-site
during the search, and those that were seized were returned
promptly following their imaging. The 15-month delay in
examining the content of those computers is in no way
"unreasonable." The very fact that investigators have not yet
begun searching for evidence proves that documents outside the
scope of the warrant have not been subject to improper
attention,[12] and a lengthy delay, in and of itself, offends no

---

[12]   Metter repeatedly challenges the government's plan to
"disseminate to third parties the entire quantity of data that
it had seized and retained." (Metter & Tepfer Mem. at 12).
This objection relates to the government's disclosure

interest that the Fourth Amendment protects.  Other valid
interests — e.g., the right to a speedy trial, see U.S. Const.
Amend. VI, or the government's obligation promptly to provide
certain documents to the defense, see Fed. R. Crim. P. 16 — are
not appropriately addressed in a motion to suppress.  Further,
as noted and detailed more fully below, the reason the files
have not yet been reviewed is due to the defendant's failure to
provide the government with the information necessary to conduct
the review in a manner that ensures the defendants' attorney-
client privileges are not abrogated.

Metter's reliance on cases that involved physical
files is misguided.  In United States v. Tamura, 694 F.2d 591
(9th Cir. 1982), the government seized from a company all
business records from the relevant time period and kept them for
six months, sifting through them for documents related to an
alleged kickback scheme.  While the court acknowledged that the
government could search through all the files for relevant

obligations under Federal Rule of Criminal Procedure 16, and is
irrelevant to the Fourth Amendment arguments addressed in
Metter's motion.  However, to the extent that the government's
plan implicates privacy concerns, the Court has already
addressed them: At the February 4 status conference, the Court
ordered that the government would provide an inventory and copy
of any seized computers to defense counsel to allow them to
identify privileged and/or personal documents.  (Metter Ex. 11
at 31-33).  In fact, the government has complied with this order
and has been awaiting responses from counsel for Metter and
Tepfer, the only two counsel to request such review, as to any
claims of privilege or privacy.

evidence, it held that the search should have occurred on-site or been subject to greater judicial oversight. Id. at 595-96. It also objected to the government's refusal to return the files not described in the warrant.[13] Id. at 596. Neither objection applies here. It would have been impossible to separate relevant computer files from irrelevant ones on-site, because of the physical equipment necessary,[14] and the defendants were not deprived of their property for any significant period of time.

In short, there is no support for the proposition that a delay like the one in this case is per se "unreasonable" in the context of executing a warrant to search hard drive images for evidence. And where the delay has been caused primarily by the defendants' failure to provide to the government in a timely fashion the information necessary to protect their privileged communications, the argument is absurd.

---

[13] Notably, the Tamura court did not reverse the defendant's conviction; the government did not attempt to introduce unlawfully seized evidence at trial and therefore, as here, there was no evidence that the defendant could identify that the district court could have suppressed. Tamura, 694 F.2d at 597.

[14] Indeed even in cases involving physical files where on-site identification of documents named in the warrant would be truly burdensome or time-consuming, courts have typically allowed entire file cabinets and boxes of paper documents to be seized for subsequent off-site review. See, e.g., United States v. Hargus, 128 F.3d 1358, 1363 (10th Cir. 1997); Crooker v. Mulligan, 788 F.2d 809, 812 (1st Cir. 1986) (collecting cases).

    3.    It Was Not Unreasonable to Delay the Search Until
          After the Attorney-Client Review

     The government has appropriately delayed the review of

the imaged computer files for evidence of the alleged crimes

until privileged documents can be isolated and removed.  Agents

performing the attorney-client review cannot be involved in the

investigation; such involvement would preclude them from viewing

privileged documents.  By contrast, agents who search for

evidence cannot view privileged documents but must necessarily

be familiar with the investigation: Only with such knowledge can

they search thoroughly and identify evidence of the crimes

specified in the warrant.  Therefore, before these agents begin

their search for evidence, the images they examine must be

cleansed of privileged documents that they are not permitted to

view.

     Metter claims that the search for evidence should have

come first because it would have been performed by "those who

possess technical expertise and are not part of the trial team."

(Metter & Tepfer Mem. at 15).  To support this argument, he

cites dicta from United States v. Cioffi, 668 F.Supp.2d 385

(E.D.N.Y. 2009), for the proposition that the government must

implement search procedures "to prevent investigators and

prosecutors from obtaining the results of a computer search

until documents within the scope of the warrant had been

                               24

segregated by a third party."[15]   (Id. (quoting Cioffi, 668 F.Supp.2d at 392)).  In essence, such an approach would require agents uninvolved with the investigation to use a strictly delineated search protocol to search the imaged files for evidence.  Put simply, that is not the law.

It is well established that in physical searches investigators can examine irrelevant documents to determine whether they fall within a warrant's scope.  See, e.g., Andresen v. Maryland, 427 U.S. 463, 482 n.11 (1976) ("In searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized."); United States v. Riley, 906 F.2d 841, 845 (2d Cir. 1990) ("[A] warrant authorizing seizure of records . . . permits officers to examine many papers in a suspect's possession to determine if they are within the described category.  But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'").

---

[15]   In the alternative, Metter asserts, the government could have imposed a similar limitation by specifying in the warrants the protocol it would use to search the computers.  (Metter & Tepfer Mem. at 15 (citing Cioffi, 668 F.Supp.2d at 392)).  However, because the warrant did not so limit the government's search, this memorandum focuses on why it would be inappropriate for agents not involved in the investigation to perform the search.

Such flexibility is even more critical when the search involves computers because evidence of crimes will almost certainly be intermingled with unrelated documents and easily can be hidden with digital technology.  See Graziano, 558 F.Supp.2d at 317 ("In today's technological age, a computer should not be a safe-haven for criminals to hide evidence of their criminal activities by unnecessarily limiting law enforcement's ability to search only certain files/documents on a computer with a certain name or term, or located in a certain area of the computer hard drive.").

Conscious of this concern, courts generally refuse to constrain agents from searching through computer files one-by-one, or in any other manner calculated to locate evidence effectively.  In Graziano, for example, the court rejected the defendant's argument that a search of his computers should be limited to "files with certain names or terms."  Id.  Instead, "it was entirely reasonable for [the examiner] to engage in a cursory review of files and documents, by opening them, to determine whether they contained evidence of illegal gambling that was within the scope of the warrant."  Id.; see also United States v. Fumo, No. 06-319, 2007 WL 3232112, at *6 (E.D. Pa. Oct. 30, 2007) ("[T]he government may open and briefly examine each computer file to determine whether it is within the description recited in the warrant."); United States v. Scarfo,

26

180 F.Supp.2d 572, 578 (D.N.J. 2001) ("Where proof of wrongdoing depends upon documents or computer passphrases whose precise nature cannot be known in advance, law enforcement officers must be afforded the leeway to wade through a potential morass of information . . . to find the particular evidence which is properly specified in the warrant."); cf. Cioffi, 668 F.Supp.2d at 392 (noting that "the majority of courts to have considered the question have not required the government to specify its search protocol in advance").[16]  But see United States v. Comprehensive Drug Testing, Inc., 579 F.3d 989, 1000 (9th Cir. 2009) (en banc) (requiring "a protocol for preventing agents involved in the investigation from examining or retaining any [computer] data other than that for which probable cause is shown").

---

[16]    For the same reasons, courts have consistently refused to require that warrants to search computer files contain a search protocol.  See, e.g., Vilar, 2007 WL 1075041, at *37-38 ("[I]t seems manifestly obvious that any requirement that a computer search be confined by a key-word search protocol would inevitably immunize criminals.  Such a simplistic search paradigm would of necessity leave out any encoded documents, or any documents that used acronyms or other abbreviations in place of the 'key words.'  Moreover, there may be numerous 'documents' that are not word-searchable and would therefore not be discovered in a search restricted to key-word inquiries.").  Of course, to require that third parties unfamiliar with the investigation conduct the search would amount to exactly this kind of limit, because investigators would have to agree upon search terms with the third parties.

Here, because investigators believed they would be able to search for evidence most effectively after the filter team isolated the attorney-client privileged documents — and because such an approach is consistent with the weight of legal authority — it was not unreasonable for the government to delay the search until those documents were identified.  Indeed, the Court authorized such a process at the February 4 status conference, during which the government and the defense agreed to perform the attorney-client review prior to a search for evidence.  (Metter Ex. 11 at 18-19).  Moreover, the delay in this case was largely the product of the defendants' failure to provide in a timely fashion an appropriate list of attorneys and their email addresses to allow the government to begin its attorney-client review.  Holding the government's execution of the warrants to be unreasonable would reward Metter for causing the delays of which he complains.  Any such holding would create strong incentives for defense counsel to delay forensic searches, confident that the longer the delay, the more likely the suppression.  The Court should decline Metter's invitation to embrace such a rule.

4.   "Blanket" Suppression Is Entirely Unwarranted

The government submits that its execution of the Computer Warrants — while not yet complete — has been fully

28

consistent with their scope.[17]  But even if the government <u>were</u>
to attempt to introduce unlawfully seized material in the
future, only that material would be suppressed.  <u>See</u> <u>United
States v. Squillacote</u>, 221 F.3d 542, 556 (4th Cir. 2000) (where
agents exceed a warrant's scope, only unlawfully seized material
is suppressed; "the properly seized evidence remains
admissible").  Imposing the remedy of suppression as to any
materials at this juncture would be premature because the
government has yet to introduce <u>any</u> evidence that the Court
could examine to determine whether it fell within the warrants'
scope.  No doubt realizing this, Metter instead asks the Court
for preemptive "blanket suppression" — the suppression of <u>all</u>
evidence obtained under the warrants.  (Metter & Tepfer Mem. at
14).  The Court should not impose this "extreme remedy," which
is entirely unwarranted here. <u>Graziano</u>, 558 F.Supp.2d at 310.

        "Government agents flagrantly disregard the terms of a
warrant so that wholesale suppression is required only when (1)
they effect a widespread seizure of items that were not within
the scope of the warrant, and (2) do not act in good faith."
<u>United States v. Liu</u>, 239 F.3d 138, 140 (2d Cir. 2000)
(citations and internal quotation marks omitted); <u>see</u> <u>also</u>

---

[17]    As Metter admits, the computer warrants were "sufficiently
particularized" (Metter & Tepfer Mem. at 11), limiting the scope
of the government's search and seizure.  Thus Metter challenges
only the government's execution of the warrants.

Graziano, 558 F.Supp.2d at 310 (calling this two-pronged
approach "well-settled").  The rationale for this rule is that
when agents flagrantly disregard a warrant's terms, they
essentially transform it into a "general warrant" forbidden by
the Fourth Amendment.  Liu, 239 F.3d at 141.  Therefore, to
satisfy the two-pronged test, the search must "actually resemble
a general search," and agents must have acted in bad faith.[18]
Id.  As a result, "the extreme remedy of blanket suppression
should only be imposed in the most extraordinary of cases."
Graziano, 558 F.Supp.2d at 310 (quoting United States v. Foster,
100 F.3d 846, 852 (10th Cir. 1996)).  The execution of the
Computer Warrants in this case fails to approach such a
standard.

        First, the warrants' execution does not resemble a
general search.  It is true that large amounts of information
were seized, but — as explained above — such seizure is a
standard first step in computer searches, followed by a targeted
search through imaged copies of the seized files.  Because this
subsequent search has not yet taken place, it cannot possibly

_____

[18]     Because the Liu court concluded its inquiry at the first
prong (i.e., found that the search did not resemble a general
search), it declined to reach the question of whether the agents
must exercise objective — as opposed to merely subjective — good
faith.  See Liu, 239 F.2d at 142.  Even under an objective
standard, the circumstances of this case make clear that agents
acted in good faith.

resemble the "general, exploratory rummaging in a person's belongings" that characterizes general searches.  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  Moreover, the privacy concerns protected by the prohibition on general searches have not been compromised in this case: The government has not deprived Metter of any physical property, and has not browsed through personal files.

Second, the government has not acted in bad faith in executing the warrants.  Rather, the delayed search of the hard drive images has resulted from the defendants' foot-dragging in response to the government's good-faith approach.  See Liu, 239 F.3d at 140 (calling blanket suppression "inappropriate" where an "extensive seizure of documents was prompted largely by practical considerations and time constraints") (quoting Marvin v. United States, 732 F.2d 669, 675 (9th Cir. 1982)).  At no point has the government misled the court or defense counsel as to the process by which agents would search the hard-drive images.  Nor has the government used the delay as pretext for improper purposes.  Instead, it has worked with the defense to devise appropriate procedures for protecting privileged documents.

Metter relies heavily on United States v. Debbi, 244 F.Supp.2d 235 (S.D.N.Y. 2003), which is entirely inapposite. There, the government seized seven boxes of files from the home

31

of a doctor suspected of health care fraud.  Id. at 236-37.
Although these included documents outside the warrant's scope —
including "personal and religious files" and other private
documents — the government refused to sort the documents and
return those that the warrant did not authorize to be seized.
Id. at 237-38.  This amounted to "blatant[] disregard" of the
warrant's scope.[19]  Id. at 238.  Here, by contrast, Metter was
not physically deprived of any personal documents.  In addition,
the Debbi agents' failure to determine what lay outside the
warrant's scope meant the government was simply holding property
that it was never authorized to seize.  Here, by contrast,
agents' seizure of the hard drives was a lawful step in an
established process for searching computers.  Indeed, the
warrant here authorized the seizure of any intermingled personal
files.  Metter's misleading analogy — which wholly ignores the
nature of computer searches — should be rejected.

>    5.    Other Property Seized from Metter's Home Was
>          Within the Scope of the Warrant

In addition to challenging the manner of the
government's search for electronically stored information,
Metter moves to suppress seized physical property: stock

---

[19]    Notably, even Debbi does not support blanket suppression:
The court there declined to embrace such an extreme measure,
calling instead for an evidentiary hearing to explore the
government's handling of the seized documents.  United States v.
Debbi, 244 F.Supp.2d 235, 238 (S.D.N.Y. 2003).

certificates of another of Metter's companies, Business Talk
Radio ("BTR"); his employment agreement with BTR; and roughly
$27,000 in cash.  (Metter & Tepfer Mem. at 11 n.6).  The BTR
documents were clearly within the scope of the warrant — which
authorized the seizure of "documents concerning the ownership,
control, and management of the Beneficiaries" — because BTR was
identified as a beneficiary.  (Metter Ex. 4 Attachment A at 4,
6).  Because the government does not intend to use the seized
cash, there is no need to address Metter's suppression argument.

    B.   The Email Warrant Was Lawful

        Metter next argues that the warrant authorizing the
search of his personal email account was unconstitutional, and
that evidence obtained under it should be suppressed. (Metter &
Tepfer Mem. at 16-17).  Metter is wrong.

        The Fourth Amendment provides that "no Warrants shall
issue, but upon probable cause, supported by Oath or
affirmation, and particularly describing the place to be
searched, and the persons or things to be seized."  U.S. Const.
Amend. IV.  The Warrants Clause constrains search warrants in
"two conceptually distinct but related ways," forbidding both
overbreadth (i.e., "seeking specific material as to which no
probable cause exists") and insufficient particularity (i.e.,
"giving so vague a description of the material sought as to
impose no meaningful boundaries").  United States v. Cohan, 628

F.Supp.2d 355, 359 (E.D.N.Y. 2009) (citing United States v. Hill, 459 F.3d 966, 973 (9th Cir. 2006)).  Together, these requirements prohibit "general warrants" — those that authorize "general, exploratory rummaging in a person's belongings." Coolidge, 403 U.S. at 467.

Metter confuses these two points of law, suggesting (without recognizing the distinction) that the Email Warrant both "implicates issues of particularity" and was "overbroad" — i.e., that there was insufficient probable cause to support the government's seizure of the entire contents of the defendant's email account.[20]  (Metter & Tepfer Mem. at 16).  In any case, contrary to Metter's claims, the warrant was neither insufficiently particular nor overbroad: It limited the scope of the government's search to emails containing evidence of crimes for which probable cause had been established.  Therefore, it was valid, and any evidence obtained under it should not be suppressed.

---

[20]   Courts, too, have sometimes "been unclear on the difference between particularity and overbreadth." Cohan, 628 F.Supp.2d at 359 n.3 (quoting United States v. SDI Future Health, Inc., 568 F.3d 684, 702 (9th Cir. 2009)).  Similarly, courts have referred to insufficiently particular warrants as overbroad, even where context makes clear that the legal analysis was focused on particularity.  See, e.g., Cioffi, 668 F.Supp.2d at 394-96 (labeling warrant "unconstitutionally broad" after performing particularity analysis).

1.    The Email Warrant Was Sufficiently Particular

Metter's claim that the Email Warrant "implicates issues of particularity" also fails.  (Metter & Tepfer Mem. at 16).

"The Fourth Amendment protects against wide-ranging exploratory searches . . . by mandating that a search warrant describe with particularity the place to be searched and the persons or things to be seized."  United States v. Dupree, No. 10-CR-627 (KAM), 2011 WL 1004824, at *29 (E.D.N.Y. Mar. 18, 2011) (citation and internal quotation marks omitted).  In this Circuit, a warrant is sufficiently particular if it "enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize."  United States v. George, 975 F.2d 72, 75 (2d Cir. 1984).

Courts assess with "flexibility" whether a warrant is sufficiently particular, requiring only "reasonable specificity" and not "surgical precision."  United States v. Triumph Capital Group, 211 F.R.D. 31, 66 (D. Conn. 2002); cf. United States v. Ventresca, 380 U.S. 102, 108 (1965) (judicial review of warrants should be "commonsensical" and "practical," rather than "overly technical").  As the Supreme Court has recognized, flexibility is especially important where the alleged crime, as here, is a "complex . . . scheme whose existence could be proved only by

35

piecing together many bits of evidence." Andresen, 427 U.S. at 482 n.10; see also United States v. Regan, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989) ("The degree to which a warrant must state its terms with particularity varies inversely with the complexity of the criminal activity being investigated.").

Contrary to Metter's arguments, a warrant may validly authorize the seizure of broad categories of documents. Such breadth will not render a warrant insufficiently particular so long as "each type of document is clearly delineated." Cohan, 628 F.Supp.2d at 361; see also Dupree, 2011 WL 1004824 at *30-31 (upholding seizure of broad categories of documents). The warrant's description of the categories to be seized must only be "sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize." Dupree, 2011 WL 1004824, at *30 (quoting Regan, 706 F. Supp. at 1110) (alteration in original). Indeed, large seizures are especially appropriate in cases such as this one, where evidence must be pieced together. Cf. Cohan, 628 F.Supp.2d at 362 (noting that in business fraud cases, "a lengthy list of categories is to be expected" in a warrant).

"[T]here is no fixed test for determining whether a warrant satisfies the particularity requirement." Vilar, 2007 WL 1075041, at *22. However, courts tend to invalidate warrants only when — unlike the warrant here — they both fail to state

36

the crime for which the search is being undertaken and contain a "catch-all" provision that effectively removes all limits on the kinds of material that executing agents can seize.  Id. (invalidating warrant that "suffer[ed] from both of these deficiencies"); see also United States v. Rosa, 626 F.3d 56, 61–62 (2d Cir. 2010) (invalidating warrant that contained provision authorizing seizure of "any written and/or printed and/or electronic stored notes or records which would tend to identify criminal conduct," without specifying the alleged crime); George, 975 F.2d at 75–76 (invalidating warrant that did not specify crime and authorized search for "any other evidence relating to the commission of a crime" (emphasis added)); cf. Cohan, 628 F.Supp.2d at 360 (upholding warrant that did not specify crime but lacked catch-all provision) (citing Andresen, 427 U.S. at 480).  But see United States v. Buck, 813 F.2d 588, 590–91 (2d Cir. 1987) (invalidating warrant that specified crime but was written "all in general boilerplate terms, without either explicit or implicit limitation on the scope of the search").

        The warrant authorizing the seizure of Metter's email account possessed neither flaw.  Thus, with respect to its specificity, it is similar to the warrant upheld in Dupree.  In that case, the court upheld as sufficiently particular a warrant that included a provision authorizing seizure of "[a]ll . . . data contained in [the computer programs] Outlook, Lotus Notes,

or Eureka" on several computers located at the subject premises. Dupree, 2011 WL 1004824, at *31. As in this case, the Dupree warrant's authorization was broad, encompassing "all" such data. However, the court reasoned that the warrant was sufficiently particular — contrary to the defendant's argument that it used "catch-all phrases" — because its description of the types of computer files to be seized was sufficiently specific and detailed that "executing officers could rationally understand and interpret" it. Id. (quoting Regan, 706 F. Supp. at 1110 (internal quotation marks omitted). The warrant also specified the criminal statutes violated. Id.

Here, the warrant also specified the crimes that Metter committed, referring to precise statutory provisions allegedly violated. Cf. Cioffi, 668 F.Supp.2d at 392 (dictum stating that crimes cited must be specific to satisfy the particularity requirement). And the "List of Items to be Seized," attached to the warrant, described — in even greater detail than in Dupree — the types of files authorized to be seized.[21] As a result, an agent executing the warrant would have understood clearly that only those file types were to be seized,

---

[21]   Although the "Fourth Amendment requires particularity in the warrant, not in the supporting documents," Dupree, 2011 WL 1004814 at *29, a warrant's particularity is assessed in light of attached and incorporated supporting documents. See United States v. Waker, 534 F.3d 168, 172 (2d Cir. 2008).

and that the search was limited in scope by the statutory provisions listed.[22]  Cf. Cohan, 628 F.Supp.2d at 364 n.4 ("[T]he relevant perspective for [a particularity] analysis is that of those at the scene of the search.").  Consistent with the cases cited above, the Fourth Amendment requires nothing further.  See Marron v. United States, 275 U.S. 192, 196 (1927) (A warrant is lawful if "[a]s to what is to be taken, nothing is left to the discretion of the [executing] officer.").

Cioffi, upon which Metter's argument depends heavily, is easily distinguished.  Contrary to Metter's claims, the warrant in that case — also authorizing the seizure of a personal email account — was not "more tailored and narrow" than here.  (Metter & Tepfer Mem. at 16).  Instead, the district court invalidated it because it failed to limit the seizure "to emails containing evidence of the crimes charged in the indictment or, indeed, any crime at all."  Cioffi, 668 F.Supp.2d at 396; see also id. at 392 (stating that a "warrant not limited in scope to any crime at all is . . . unconstitutionally broad"

---

[22]  Metter makes much of language in the warrant implying that "all" the files authorized to be seized were "evidence, fruits, and instrumentalities" of the alleged crimes.  (Metter & Tepfer Mem. at 17).  Such a reading reflects a formalism that courts have rejected in this context.  See United States v. Ventresca, 380 U.S. 102, 108 (1965) (rejecting "overly technical" readings).  Moreover, the attached Email Affidavit makes clear that the executing agents' search would involve culling only the relevant emails from the account.

(quoting George, 975 F.2d at 77)).  The court noted that the
supporting affidavit would have saved the warrant by
demonstrating "a connection between the warrant and a particular
crime," but it was not properly attached and incorporated.  Id.
at 393, 396.  Here, by contrast, the warrant limited agents'
seizure to "evidence, fruits, and instrumentalities" of specific
statutory violations.  And, unlike in Cioffi, the Email
Affidavit was attached.[23]  Therefore, the warrant in this case
provided significantly more guidance for executing agents to
ascertain the particular items they were authorized to seize.

      2.  The Email Warrant Was Not Overbroad

      Metter asserts that the Email Warrant was invalid
because agents "sought the broadest imaginable warrant . . .
without putting forth any adequate basis for a seizure of all of
Mr. Metter's personal communications."  (Metter & Tepfer Mem. at
16).  This objection amounts to a claim that the warrant was
overbroad: that in permitting agents to seize everything in the
account, whether related or unrelated to the fraudulent scheme,
the warrant authorized the seizure of items for which there was
no probable cause.  This claim reflects a misunderstanding of

---

[23]    Indeed, the court in Cioffi addressed whether the affidavit
was properly attached and incorporated only after noting that
the warrant itself lacked a reference to specific crimes.  See
668 F.Supp.2d at 392-93.  Here, because the warrant specified
the applicable criminal statutes on its face, the proper
attachment and incorporation of the Email Affidavit is moot.

how searches of email accounts actually work and are supposed to work, and should thus be rejected.

As explained above, see supra Section I.A.4, it is well established that the government may examine files unrelated to alleged crimes in order to determine whether they fall within a warrant's scope.  See Andresen, 427 U.S. at 482 n.11; Riley, 906 F.2d at 845.  Courts have consistently extended this logic to computer searches, in which relevant evidence will almost certainly be intermingled with unrelated files.[24]  See, e.g., Graziano, 558 F.Supp.2d at 316-17 (upholding search where examiner "engage[d] in a cursory review of files and documents, by opening them, to determine whether they contained evidence . . . within the scope of the warrant"); Fumo, 2007 WL 3232112, at *6 ("[T]he government may open and briefly examine each computer file to determine whether it is within the description recited in the warrant."); Scarfo, 180 F.Supp.2d at 578 ("[L]aw enforcement officers must be afforded the leeway to wade through

---

[24]    Metter recognizes as much in his argument regarding the Computer Warrants, where he describes the "fairly routine" process whereby "officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant." (Metter & Tepfer Mem. at 11-12 (citing Fed. R. Crim. P. 41(e)(2)(b)). Metter then manages to argue that the Email Warrant — which authorizes exactly such a process — is unconstitutional.

a potential morass of information . . . to find the particular evidence which is properly specified in the warrant.").

Email searches are no different — rather than being stored on a defendant's hard drive, the files are simply stored with an ISP.  Because, as a practical matter, it is nearly impossible to conduct an email search that does not involve obtaining the entire contents of an account from the ISP, such a broad initial seizure is standard practice for executing agents (Metter Ex. 8 ¶ 130), and agents who obtain warrants to search emails for evidence of a crime are authorized by law to obtain all communications and other files relating to the account.  See 18 U.S.C. § 2703(a) (authorizing the seizure of communications from ISPs pursuant to a warrant issued under the Federal Rules of Criminal Procedure); 18 U.S.C. § 2703(c)(1)(a) (authorizing the seizure of other subscriber information); Metter Ex. 8 ¶¶ 14-17 (reviewing legal authority for seizure of email accounts relating to Spongetech).   After obtaining the files, agents then "must carefully open and examine all the stored data to determine which of the various files are evidence, fruits, or instrumentalities of the crime."  (Metter Ex. 8 ¶ 130).

In this case, Metter mischaracterizes the search by insisting that the email account was "personal" and used for "communications that were confidential, private, privileged

42

and/or entirely unrelated to Spongetech."[25]   (Metter & Tepfer

Mem. at 2).   First, the account was not exclusively personal.

It was seized because the affidavit detailed that Metter used

the account extensively in furtherance of the Spongetech Scheme.

(Metter Ex. 8 ¶¶ 119-20).   Additionally, whether unrelated

documents were seized is irrelevant because, as explained above,

agents are authorized to search through the seized emails for

evidence of the crimes specified in the warrant.

Cioffi is once again readily distinguished.   In that

case, because the warrant did not specify the alleged crimes for

which the search was being undertaken, there were no appreciable

limits on the government's invasion of the defendant's personal

emails — under the warrant's authority, the executing agents

could have looked for evidence of any crime.   Here, by contrast,

the warrant circumscribed the government's search to "evidence,

fruits, and instrumentalities" of specific statutory violations.

Therefore, contrary to Metter's claims, it did not authorize the

---

[25]   Metter claims that the government, under the Email
Warrant's authority, has "taken and kept years worth of Mr.
Metter's personal and private communications."  (Metter & Tepfer
Mem. at 3).  This statement is false.  Searches of computer
files are not like physical ones, because files the government
seizes from an ISP — like all files transmitted from one
computer to another — are digital copies.  In this context, the
fact that the government has "kept" the files is, on its own,
meaningless, since Metter has never been denied access to the
emails.  Cf. supra Section I.A.4 (explaining the difference
between "keeping" hard drive images and keeping physical
documents).

seizure of "anything incriminating of any kind." (Metter & Tepfer Mem. at 18). Additionally, the limits in the warrant mean that a remedy like Cioffi's is inappropriate here. There, the warrant itself authorized the unlawful search, and the court would have had to rewrite it entirely to implement appropriate constraints on the government — all evidence obtained under this "general warrant" was suppressed. Here, the warrant was not "general;" as described above, it appropriately guided executing agents. Thus, any unlawful intrusion — if it were to occur — would result only from the government's improper conduct during the yet-to-be-performed forensic search for evidence, the remedy for which would be suppression only of evidence the government attempted to use that was outside the warrant's scope. See Squillacote, 221 F.3d at 556. Metter's invitation for the Court to rule now on such a hypothetical, potential intrusion is wholly improper. Cf. supra Section I.A.4.

> ### 3. Evidence Obtained Under the Email Warrant Falls Within the Good Faith Exception

Even if the Court were to find that the search warrants were not valid — it should not — evidence obtained under them is admissible because executing agents acted in good faith. In United States v. Leon, 468 U.S. 897 (1984), the Supreme Court held that the Fourth Amendment's exclusionary rule does not apply where officers act "in objectively reasonable

reliance on a subsequently invalidated search warrant." 468
U.S. at 922; see also United States v. Salameh, 152 F.3d 88, 114
(2d Cir. 1998) (exception to the exclusionary rule applied
because the officers "acted in good faith reliance on a facially
valid warrant").

In addition, courts apply the exclusionary rule only
as a means of deterring police misconduct. See Leon, 468 U.S.
at 916 (finding no basis for the idea that magistrates must be
deterred from contravening the Fourth Amendment, much less that
the exclusion of evidence would accomplish this objective);
Illinois v. Krull, 480 U.S. 340, 349-55 (1987) (citing Leon to
uphold search where officer relied on a warrant in good faith).
After a magistrate makes a determination of probable cause, a
law enforcement officer who reasonably relies upon a validly
issued warrant has complied with the law. Leon, 468 U.S. at
921. This reliance must be objectively reasonable: Courts
consider whether or not "[a] reasonably well-trained officer
would have known that the search was illegal despite the
magistrate's authorization." United States v. Moore, 968 F.2d
216, 222 (2d Cir. 1992); see also Leon, 468 U.S. at 922-23,
n.23. If officers rely in good faith upon a warrant that is
later found to be overbroad or vague, the exclusionary rule is
not an appropriate remedy. See Massachusetts v. Sheppard, 468
U.S. 981, 987-88 (1984); Moore, 968 F.2d at 222.

When officers rely on a facially valid search warrant, suppression is only appropriate if: (1) the magistrate "was misled by information in an affidavit that the affiant knew was false;" (2) "the issuing magistrate wholly abandoned his judicial role;" (3) the affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant is "so facially deficient — i.e., in failing to particularize the place to be searched or the things to be seized — that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923.  Suppression is not appropriate here.

The agents in this case acted in good faith.  They applied for the warrant properly, and relied upon the magistrate's authorization to seize the email accounts from the ISP.  Metter makes no allegations that the affidavit contained knowingly false statements, the magistrate abandoned his judicial role, or the affidavit lacked probable cause.  And even if the Email Warrant were deemed insufficiently particular or overbroad — it was not — it was clearly not so "facially deficient" that reliance on it was unreasonable.  Authority to search the entire contents of an email account is well established, and the Email Affidavit stated that agents would use standard search practices to locate evidence of the specified crimes.  The agents cannot be faulted for relying on a

46

warrant that they understood to authorize exactly that, especially after three separate magistrates had issued warrants authorizing essentially the same search.  Moreover, any deficiencies in the warrant did not result from the agents' impropriety, so the deterrent effect of suppression is both unnecessary and inapposite.

The Cioffi court held that the good-faith exception did not apply because a reasonably well-trained officer would have known that a "general warrant" — one "authorizing the seizure of evidence without mentioning a particular crime" — was unlawful.  Cioffi, 668 F.Supp.2d at 397.  Here, the warrant was more specific, listing specific crimes on its face and attaching the supporting affidavit.  At the very least, given the warrant's similarity to the one upheld in Dupree, and the fact that Second Circuit courts have consistently upheld warrants that specify an alleged crime, agents cannot be faulted for relying on it in good faith.  Cf. Cohan, 628 F.Supp.2d at 367 (finding that "legal uncertainty" — in that case, around whether a warrant must specify a time frame for target documents — "trigger[ed] the 'good-faith' exception" because a "reasonably well-trained officer" would not know whether dates were required).  Thus, the Court should not suppress the evidence obtained under the Email Warrant.

47

II.  THE MOTIONS BY METTER, CAVANAGH AND NICOLOIS TO DISMISS THE
     COUNTS AGAINST THEM FOR LACK OF VENUE SHOULD BE DENIED
     EXCEPT AS TO COUNT SEVEN, WHICH SHOULD BE DISMISSED WITHOUT
     PREJUDICE

          The Court should deny defendant Metter's motion to

dismiss the superseding indictment for lack of venue.  With

respect to defendants Cavanagh and Nicolois's motion, the Court

should deny the motion to dismiss Count Six and grant the motion

to dismiss Count Seven without prejudice.

     A.   Legal Standard

          Defendants in criminal cases have the right to be

tried in a district where venue is properly laid.  U.S. Const.

Art. III, § 2, cl. 3; U.S. Const. Amend. VI; Fed. R. Crim. P.

18; see also, e.g., United States v. Brennan, 183 F.3d 189 (2d

Cir. 1999).  "[V]enue is proper in a district where (1) the

defendant intentionally or knowingly causes an act in

furtherance of the charged offense to occur in the district of

venue or (2) it is foreseeable that such an act would occur in

the district of venue."  United States v. Svoboda, 347 F.3d 471,

483 (2d Cir. 2003).  Consequently, venue may be proper in more

than one district.  See 18 U.S.C. § 3237(a) ("Except as

otherwise expressly provided by enactment of Congress, any

offense against the United States begun in one district and

completed in another, or committed in more than one district,

may be inquired of and prosecuted in any district in which such

offense was begun, continued, or completed."); see also United States v. Reed, 773 F.2d 477, 480 (2d Cir. 1985) ("[T]he constitution does not command a single exclusive venue.").

To survive a pretrial motion to dismiss an indictment for lack of venue, the government need only show that it has alleged sufficient facts in the indictment to support a finding that venue is proper.  See, e.g., United States v. Mahaffy, No. 05-CR-613, 2006 WL 2224518, at *7 (E.D.N.Y. Aug. 2, 2006); United States v. Peterson, 357 F.Supp.2d 748, 751-52 (S.D.N.Y. 2005); United States v. Bellomo, 263 F.Supp.2d 561, 579-80 (E.D.N.Y. 2003).

Venue is supported by sufficient facts when an indictment simply alleges that criminal conduct occurred in the district where the charges have been filed.  See United States v. Bronson, No. 05-CR-714, 2007 WL 2455138, at *4 (E.D.N.Y. Aug. 23, 2007) ("The law of this Circuit is clear that the Government's burden is satisfied with regard to pleading venue by alleging that criminal conduct occurred within the venue, even if phrased broadly and without a specific address or other information.").

A court must accept as true the facts in the indictment.  United States v. Goldberg, 756 F.2d 949, 950 (2d Cir. 1985).  Additionally, courts should only consider the information that is alleged in the indictment and not any facts

49

proffered by the defendant.  See, e.g., United States v. Alfonso, 143 F.3d 772, 776-77 (2d Cir. 1998) (finding it was "premature" for a district court, in ruling on a pretrial motion, to infer facts that the government would prove at trial beyond those on the face of the indictment); Bellomo, 263 F.Supp.2d at 580 (E.D.N.Y. 2003) (finding only after the government has presented its case can "an informed determination . . . be made whether the government has proved venue by a preponderance of the evidence and whether the defendant's claim that it cannot do so is wrong"); United States v. Szur, No. S5 97 CR 108 (JGK), 1998 WL 132942, at *9 (S.D.N.Y. Mar. 20, 1998) ("Whether such acts alleged in the Indictment in fact occurred in the Southern District of New York is appropriately left for trial . . . .").

B.   Counts One Through Six and Eight Through Ten Properly Plead Venue

1.   Counts One Through Five

Counts One through Five allege that the defendants' criminal conduct occurred "within the Eastern District of New York and elsewhere."  Ind. ¶¶ 24, 25, 27, 28, 30, 32, 34.  Such language alleges sufficient facts to properly plead venue. Bronson, 2007 WL 2455138 at *4 (holding an indictment alleging conduct "within the Eastern District and elsewhere" sufficient to plead venue); Bellomo, 263 F.Supp.2d at 579 (E.D.N.Y. 2003)

(same); see also United States v. Heredia, No. 02-CR-1246, 2003
WL 21524008, at *5 (S.D.N.Y. Jul. 3, 2003) ("On its face, the
indictment alleges that both offenses occurred "in the Southern
District of New York and elsewhere," which is sufficient to
resist a motion to dismiss.") (citing Szur, 1998 WL 132942, at
*9).  Therefore, Metter's motion to dismiss these counts fails.

     2.   <u>Count Six</u>

     Count Six alleges that defendants Cavanagh and
Nicolois engaged in the crime of structuring "within the
Southern District of New York and elsewhere."  Ind. ¶ 41.  Where
conduct relating to a charge occurred in multiple districts, an
indictment is not facially defective when it includes the phrase
"and elsewhere" to plead venue because it is reasonable for the
defendant to assume that the government intends to prove
criminal conduct occurred in the district where the indictment
was filed.  See United States v. Novak, 443 F.3d 150, 162 (2d
Cir. 2006).  Therefore, the fact that Count Six alleges criminal
activity occurred "within in the Southern District of New York
and elsewhere," combined with the fact that the government has
filed this charge in the Eastern District of New York, is
sufficient on its face to allege criminal acts occurred in the

Eastern District and properly plead venue.[26]   Ind. ¶ 41 (emphasis added).

Nevertheless, the government intends to file a superseding indictment that will explicitly state that the defendants did, indeed, engage in this conduct in the Eastern District of New York.

### 3.   Counts Eight Through Ten

Counts Eight through Ten allege that Moskowitz, Metter and Speranza, respectively, committed perjury before the SEC during its investigation into the securities fraud with which the defendants are charged.   Metter argues that venue is not properly pled because the charges allege that the defendants committed perjury in Washington, D.C., before court proceedings were filed in this district.   (Metter's Memorandum of Law at 10-12) ("Metter Mem.").   Metter is wrong.

The perjury here is charged under 18 U.S.C. § 1621, which does not include a provision that explicitly indicates where venue lies.   See United States v. Savoy, 38 F.Supp.2d 406, 413 (D. Md. 1998).   "Where a federal statute defining an offense does not explicitly indicate where a criminal act is deemed to have been committed, 'the site of a charged offense must be determined from the nature of the crime alleged and the location

---

[26]   Although the government need not proffer facts to support its allegations that venue is proper in the Eastern District of New York, it will do so.   See infra Section II.B.

of the act or acts constituting it . . . .'" Svoboda, 347 F.3d
at 482 (quoting United States v. Cabrales, 524 U.S. 1, 5
(1998)).  In perjury cases, to make such a determination, the
Second Circuit applies "a substantial contacts rule that takes
into account a number of factors — the site of the defendant's
acts, the elements and nature of the crime, the locus of the
effect of the criminal conduct, and the suitability of each
district for accurate factfinding." United States v. Beech-Nut
Nutrition Corp., 871 F.2d 1181, 1188-89 (2d Cir. 1989) (quoting
Reed, 773 F.2d at 481).

        In United States v. Reed, the Second Circuit applied
the substantial contacts rule to determine the proper venue for
a charge of perjury under 18 U.S.C § 1623.  The court held that
the defendant's perjury during a deposition in California, which
was given ancillary to court proceedings pending in the Southern
District of New York, implicated the Southern District and
thereby made venue proper in both districts.  Reed, 773 F.2d at
483.[27]

---

[27]    In a case regarding venue for continuous offenses — not
perjury or obstruction of justice — the Second Circuit has noted
in dictum that the substantial contacts test is not a "formal
constitutional rule" but is "helpful in determining whether a
chosen venue is unfair or prejudicial to a defendant." United
States v. Saavedra, 223 F.3d 85, 93 (2d Cir. 2000).  This
comment in no way disturbs the Second Circuit's holding
concerning the proper venue for perjury as set forth in Reed.

Reed here controls.  To begin, the fact that the
defendant in Reed was charged under Section 1623, not Section
1621 is of no moment.  In United States v. Manfredi, 789 F.
Supp. 961 (D. Ind. 1992), the court applied Reed to find venue
for perjury under Section 1621 proper in the Northern District
of Indiana where the defendant was charged with committing
perjury while giving a deposition to the SEC in Chicago during
its investigation into his Indiana-based fraud.  Id.  In
response to the defendant's objection to applying Reed's holding
to Section 1621 rather than Section 1623, the court stated:

> Defendant's argument . . . ignores the
> obvious similarity between offenses under 18
> U.S.C. § 1621, and offenses under 18 U.S.C.
> § 1623.  Both statutes criminalize the act
> of perjury, and their only difference is
> where that perjury actually takes place, and
> the level of specificity as to the nature of
> the perjury covered.  The effect, though, of
> the acts of perjury covered by the two
> statutes remains the same.  Perjury, whether
> it occurs during a deposition or a court or
> grand jury proceeding, hinders the effective
> resolution of the ancillary and/or parent
> proceedings, as well as government
> investigations into other crimes.  Thus, the
> intent behind the two statutes is one and
> the same, and the analysis in Reed as to
> what effect that intent has on questions of
> venue should apply with equal force to
> prosecutions under § 1621.

Id. at 963.  See also Savoy, 38 F.Supp.2d at 414 ("[T]he court's
opinion in Reed supports a finding that venue in this district
for Mr. Savoy's prosecution under § 1621[(2)] is proper.").

54

The point on which Metter hangs his hat — that in
Reed, court proceedings had begun prior to the date of the
alleged perjury — is also inapposite.  In United States v.
Clark, No. 87-CR-49, 1987 WL 13273, (S.D.N.Y. June 30, 1987),
the court applied Reed to find that venue was properly pled in
the Southern District of New York when the defendant committed
perjury during a deposition conducted in Washington, D.C, as a
part of the SEC's investigation into his securities and wire
fraud.  The court explained that venue was proper since (i) the
investigation later resulted in a civil suit in New York, (ii)
the defendant's perjury impeded the investigation that resulted
in that suit, and (iii) the defendant was later charged with
criminal conduct in New York for a New York-based crime that
caused harm in New York.  Id. at *4.

Metter cites United States v. Smith, 641 F.3d 1200
(10th Cir. 2011) and Manfredi for the proposition that perjury
made during an investigation — i.e., prior to the initiation of
court proceedings — cannot support venue.  In fact, in Smith, a
false statements case, the Tenth Circuit rejected venue because
it explicitly declined to adopt the Second Circuit's substantial
contacts test, finding that "a crime must be prosecuted in the
district where it was committed."  Smith, 641 F.3d at 1208.
Because this case is in the Second Circuit, where Reed controls,
Smith is without value.

Metter's citation to Manfredi is even more puzzling.
There, it is true that the perjury alleged took place after the
initiation of related civil proceedings, but the court hinged
its ruling on the effect the defendant's false statements had on
the investigation:

> The conspiracy charge is the result of an
> SEC investigation into an investment scheme
> that involved certain investment companies
> that are named as defendants in the
> parallel civil proceeding pending in this district
> [the Northern District of Indiana].  The SEC
> took the defendant's deposition in Chicago
> for the purpose of aiding this
> investigation.  Defendant was asked about
> his involvement with those investment
> companies, and his answers not only form the
> basis of the perjury charges, but also, they
> more than likely supplied the government
> with a reason to pursue the [underlying
> criminal] conspiracy charge.  Therefore, the
> crimes of conspiracy and perjury in this
> case are 'inextricably bound', and venue
> over them should be based in this district.

Manfredi, 789 F. Supp. at 964 (citing Reed, 773 F.2d at 483)
(emphasis added).

The same analysis performed in Clark, Reed and
Manfredi dictates the same result here.  Indeed, the facts at
bar support venue under each of the criteria the Second Circuit
identified in Reed to assess the propriety of venue in a court
other than one located where the criminal action took place: (i)
"the very definition of the crime may implicate more than one
district," (ii) "places that suffer the effects of a crime are

entitled to consideration for venue purposes," and (iii) the places where evidence of the crime may exist should also be considered.  Reed, 773 F.2d at 481-82.

First, the crime alleged necessarily implicated this district.  Prior to the defendant's statements supporting the perjury charges, the SEC was investigating violations of law that occurred in the Eastern District of New York.  This investigation led to a civil complaint against the defendants in the Eastern District for their conduct there, and the current Eastern District criminal charges for that same conduct followed.  Such facts — false statements in one place leading to charges elsewhere — are specifically contemplated by Section 1621 itself:  "This section is applicable whether the statement or subscription is made within or without the United States."

Next, the locus of the effect of the perjury is also in this district.  The perjury here alleged undermined the government's investigation into conduct in this district and its ability to bring civil and criminal proceedings to address that conduct in this district.  As such, the perjury charges and the other civil and criminal allegations against the defendants are "inextricably bound" to each other, Manfredi, 789 F. Supp. at 964 (quoting Reed, 773 F.2d at 483), and, as in Clark, support venue.

57

Finally, evidence of Metter's perjury is found in this district.  Specifically, the indictment alleges that in this district, the defendants conspired to submit "phony Spongetech customer telephone numbers" to the "regulators" and set up websites for the companies that Metter claimed were Spongetech's three biggest customers.  Ind. ¶¶ 28, 47.  This goes directly to Metter's <u>mens</u> <u>rea</u> in "willingly" giving false testimony.  Additionally, any "witnesses necessary to prove or disprove the falsity" of the defendants' statements are "just as likely" — in fact, more likely — to be in the Eastern District than in Washington, D.C.  <u>Reed</u>, 773 F.2d at 483.

Given these facts, under controlling Second Circuit authority, venue in the Eastern District of New York is properly pled, and the defendants' motions to dismiss Counts Eight through Ten should be dismissed.

C.   The Government Will Prove Facts at Trial to Support <u>Venue on All Counts</u>

Although the government need not detail facts beyond those alleged in the indictment to defeat the defendants' venue motions, the government nevertheless proffers facts it expects to introduce at trial that support venue in the Eastern District of New York.

1.   <u>Counts One and Three</u>

Counts One and Three charge Metter and others with

conspiracy to commit securities fraud and securities fraud,
respectively.  It is "settled that 'any nontrivial act in the
forum district which helps to accomplish a securities fraud law
violation is sufficient to establish venue.'"  SST Global
Technology, LLC v. Chapman, 270 F.Supp.2d 444, 453 (S.D.N.Y.
2003).  Venue is proper where it is "foreseeable that such an
act would occur in the district of venue."  See Svoboda, 347
F.3d at 483.  When defendants are charged with a conspiracy to
commit a crime, venue is proper where any conspirator committed
any overt act of the underlying crime.  United States v.
Naranjo, 14 F.3d 145, 146-47 (2d Cir. 1994).

At trial, the government expects to introduce evidence
showing that the defendants committed nontrivial acts of
securities fraud in the Eastern District when they transmitted
materially false statements contained in SEC filings and press
releases to investors in the Eastern District and perpetrated
the fraud on victims in the Eastern District.  The government
will also show that conspirators located in the Eastern District
engaged in acts in furtherance of the securities fraud in the
Eastern District.

### 2.   Counts Two and Four

Counts Two and Four charge Metter and others with
conspiracy to commit obstruction of justice and obstruction of
justice, respectively.  The government expects to introduce

evidence at trial that in order to obstruct the SEC
investigation into the defendants' unlawful activity, Speranza
took numerous steps to create websites for fake companies from
within the Eastern District of New York.  Furthermore, the
government intends to introduce evidence that upon Metter's
request, while located in the Eastern District of New York, and
for the purpose of misleading SEC investigators, Speranza
provided Metter with telephone numbers for fake companies.

### 3.   Count Five

Count Five charges Metter and others with conspiracy
to commit money laundering.  At trial, the government expects to
introduce evidence that transactions in furtherance of the money
laundering took place in the Eastern District of New York.

### 4.   Count Six

Count Six charges Cavanagh and Nicolois with
structuring.  At trial, the government expects to introduce
evidence that the defendants' structuring included transactions
in which they deposited checks drawn from a bank account located
in the Eastern District at a bank located in the Eastern
District.

### 5.   Counts Eight, Nine and Ten

Counts Eight, Nine and Ten charge defendants
Moskowitz, Metter and Speranza, respectively, with perjury.  As
previously stated, the government expects to introduce evidence

at trial that these defendants perjured themselves in relation to unlawful acts they committed in the Eastern District of New York.  The government also intends to introduce evidence that this perjury influenced the investigation into these unlawful acts by causing months of long delays as the SEC sought to determine whether the fake companies set-up by the defendants ever existed.  Finally, the government expects to introduce evidence obtained in the Eastern District of New York to show the defendants willfully gave false testimony, including evidence seized from Speranza's computer detailing the defendants' knowledge that their statements were false.

> D.   If This Court Were to Find Venue Lacking for Any Count, It Should Only Dismiss that Count

Metter "requests that the Indictment be dismissed." (Metter Mem. at 14).  It appears Metter is moving (i) to dismiss the entire indictment, including counts that do not relate to him,[28] and (ii) to dismiss the entire indictment if it finds even one count that does not allege sufficient facts to properly plead venue.

Both arguments fail.  First, Metter does not have standing to move this court to dismiss Counts Six, Seven, Eight

---

[28] Metter argues that Counts Six and Seven do not support a finding of venue even though these counts only relate to defendants Cavanagh and Nicolois.  (Metter Mem. at 12).

and Ten, which do not list him as a defendant.  See United States v. Tanner, 471 F.2d 128, 139-40 (7th Cir. 1972).

Second, it is axiomatic that the Court considers each challenge individually.  E.g., United States v. Royer, 549 F.3d 886, 894 (2d Cir. 2008) (when an indictment charges multiple counts, the court must consider "the appropriateness of venue with regard to each of the counts"); United States v. Tzolov, 642 F.3d 314, 318-21 (2d Cir. 2011) (vacating the defendant's convictions on counts for which venue did not exist and upholding the convictions on count for which venue did exist); Novak, 443 F.3d at 150 (same).  If the Court were to find that any individual count lacks venue in this case, it should only dismiss that count.

E.   Count Seven Should Be Dismissed Without Prejudice

Count Seven charges Cavanagh and Nicolois with criminal contempt of court under 18 U.S.C. § 401 for violating an order given by the Southern District of New York in an unrelated case when they engaged in the crime of structuring in this case.  This Court may not exercise power under Section 401 to hold Cavanagh and Nicolois in contempt of another court's order.  See United States v. Diapulse Corp., 365 F. Supp. 935, 936-41 (E.D.N.Y. 1973); see also Waffenschmidt v. Mackay, 763 F.2d 711, 716 (5th Cir. 1985) ("Enforcement of an injunction through a contempt proceeding must occur in the issuing

jurisdiction because contempt is an affront to the court issuing the order." (citing Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 452 (1932)).  As a result, the government concedes that Count Seven of the indictment should be dismissed.

The Court should not, however, dismiss the count with prejudice.  A Federal court has the "inherent common law power to vindicate its own decrees".  Diapulse, 365 F. Supp. at 939; see also Bloom v. Illinois, 391 U.S. 194, 202-08 (1968) (discussing the origin and evolution of criminal contempt power in the United States).  Because this Court does not have jurisdiction to hold Cavanagh and Nicolois in contempt of an order it did not give, it should not bar the government from petitioning the Southern District of New York to exercise its authority to hold the defendants in contempt, which is precisely what the government intends to do.

For these reasons, the Court should grant Cavanagh and Nicolois's motion to dismiss Count Seven of the indictment, but do so without prejudice, and deny the remainder of the defendants' motions to dismiss on grounds of venue.

III. CAVANAGH AND NICOLOIS'S MOTION TO DISMISS COUNTS SIX AND
     SEVEN FOR VAGUENESS SHOULD BE DENIED

          In addition to arguing that venue is improper, see
supra, Section II, Cavanagh and Nicolois argue that the charges
against them in Counts Six and Seven of the superseding
indictment are impermissibly vague.  (Cavanagh and Nicolois's
Memorandum of Law at 1) ("Cavanagh & Nicolois Mem.").  The Court
should reject this argument and deny their motion.

     A.   Legal Standard

          An indictment must contain "a plain, concise, and
definite written statement of the essential facts constituting
the offense charged."  Fed. R. Crim. P. 7(c).  This requirement
"performs three constitutionally required functions": It
fulfills a defendant's Sixth Amendment right to "be informed of
the nature and cause of the accusation" against him, and it
serves the Fifth Amendment protections against double jeopardy
and prosecution for crimes based on evidence not presented to a
grand jury.  United States v. Walsh, 194 F.3d 37, 44 (2d Cir.
1999).

               The Second Circuit has repeatedly held that:

               An indictment need only provide sufficient
               detail to assure against double jeopardy and
               state the elements of the offense charged,
               thereby apprising the defendant of what he
               must be prepared to meet.  Under this test,
               an indictment need do little more than to
               track the language of the statute charged

> and state the time and place (in approximate
> terms) of the alleged crime.

United States v. Tramunti, 513 F.2d 1087, 1113 (2d Cir. 1975)

(citations omitted); see also Walsh, 194 F.3d at 44 (noting that

the Second Circuit has "consistently upheld" indictments that

fit this description); United States v. Alfonso, 143 F.3d 772,

776 (2d Cir. 1998); United States v. Stavroulakis, 952 F.2d 686,

693 (2d Cir. 1992).  In reviewing a motion to dismiss, a court

must accept all factual allegations in the indictment as true.

See Alfonso, 143 F.2d at 776.

An indictment need not set forth evidence or details

of how the alleged crime was committed.  See United States v.

Carr, 582 F.2d 242, 244 (2d Cir. 1978); United States v. Urso,

369 F.Supp.2d 254, 266 (E.D.N.Y. 2005) ("There is no requirement

that an indictment set forth with specificity any particular

factual element of the crimes charged.").  However, courts have

sometimes suggested that "'a valid indictment must [] provide

something more' than approximate dates and locations, and cannot

merely list the statutory elements." United States v. Galestro,

No. 06-CR-285 (ARR), 2008 WL 2783360, at *2 (E.D.N.Y. July 15,

2008) (quoting Urso, 369 F.Supp.2d at 267)).  The extent to

which additional details are necessary depends on the precision

of the statutory language tracked by the indictment: Only if the

charges track a statute that is vague or uses undefined terms

are further details required.  See Russell v. United States, 369
U.S. 749, 766 (1962).

Even when additional details are required, they can be
minimal, and courts may look at the broader indictment or in the
record for necessary details.  See Walsh, 194 F.3d at 45.  For
example, the Galestro court upheld a charge of "loansharking"
(i.e., making extortionate extensions of credit) because the
indictment — in addition to tracking the statute and providing
rough dates and locations — named the criminal organization with
which the defendant was associated.  Galestro, 2008 WL 2783360,
at *2-3.  And while "a bill of particulars or discovery cannot
save a defective indictment, where the indictment has been found
even minimally sufficient, a court may look to the record as a
whole in determining whether the defendant is protected from
double jeopardy . . . and has had an adequate opportunity to
prepare his defense."  Walsh, 194 F.3d at 45 (citation and
internal quotation marks omitted).

Because Counts Six and Seven of the superseding
indictment meet the forgiving legal standard described above,
the Court should reject the defendants' claims that the charges
against them are impermissibly vague.

B.   Count Six Is Not Impermissibly Vague

Cavanagh and Nicolois argue that because Count Six
(structuring) fails to identify any specific allegedly illegal

transactions, it impermissibly charges them "with a <u>generic type</u> <u>of criminal activity</u> (structuring) rather than any <u>particular</u> <u>criminal act</u>," and thus within the two-year period alleged, "an unknown number of various events or transactions could have taken place."  (Cavanagh & Nicolois Mem. at 8, 6).  The defendants' argument should be rejected.

Like other indictments "consistently upheld" in this Circuit, <u>Urso</u>, 194 F.3d at 44, Count Six meticulously "track[s] the language of the statute charged and state[s] the time and place (in approximate terms) of the alleged crime."  <u>Tramunti</u>, 513 F.2d at 1113.  <u>Compare</u> Ind. ¶ 40, <u>with</u> 31 C.F.R. § 103.11(gg); <u>see also</u> Ind. ¶ 41 (specifying date range and location).  Count Six also contains a lengthy introductory section, incorporated by reference, which describes the Spongetech scheme in detail and notes that Cavanagh and Nicolois were employed at the company.  <u>See id.</u> ¶¶ 1-22, 35; <u>cf.</u> <u>Galestro</u>, 2008 WL 2783360, at *5 ("The indictment alleges that defendant is a soldier and associate in the Bonanno organized crime family. . . . The indictment thus implies that defendant participated in the loansharking activity alleged in the indictment . . . in his capacity as a member of the Bonanno [family], and in conjunction with other members of that organization.").  Such details, combined with the dates and the allegation that the crimes took place at least partly within the

67

Southern District of New York, provide Cavanagh and Nicolois
with sufficient notice of the charges they face and would allow
them to assert double jeopardy if they were to be charged again
with structuring in connection with the Spongetech scheme.
Further, there is no risk that the government will try Cavanagh
and Nicolois for crimes other than those charged by the Grand
Jury, because the government may only present evidence related
to the Spongetech scheme at trial.  The superseding indictment
thus satisfies the pleading requirements of Rule 7(c).

     In addition to the factual context provided by the
superseding indictment, Count Six also tracks statutory language
that is precise and self-explanatory.  See Urso, 369 F.Supp.2d
at 266 ("The quantum and type of factual specificity required .
. . varies according to the charges alleged against the
defendant.").  Cavanagh and Nicolois cite United States v.
Pirro, 212 F.3d 86 (2d Cir. 2000), and United States v. Labate,
No. S100CR.632, 2001 WL 533714 (S.D.N.Y. May 18, 2001), both of
which are inapposite because they concerned criminal statutes
that were far more vague than here.  The crime charged in Pirro
— making a material omission on a tax return — required a
"crucial background fact that gives rise to the duty to disclose
the [omitted] fact."  Pirro, 212 F.2d at 93.  The court held
that the indictment was impermissibly vague because it did not
allege that fact — i.e., the fact that "made the omission

criminal." Id. (emphasis added). Similarly, in Labate, the district court dismissed a racketeering charge for vagueness because the statutory phrase "conduct or participate" — which the indictment included without elaboration — had a "specific meaning not immediately apparent from the plain language of the statute." Labate, 2001 WL 533714, at *4.

Structuring, by contrast, has a precise statutory definition, foreclosing the possibility that Cavanagh and Nicolois would not know a "crucial fact" that made their alleged conduct criminal: Put simply, if they "[broke] down [] amounts of currency into amounts of $10,000 or less prior to transacting business with domestic financial institutions, for the purpose of evading the currency reporting requirements of Title 31, Code of Federal Regulations, Section 103.22," they committed structuring.[29] Ind. ¶ 40. Nor does the structuring statute contain vague or confusing phrases that require explanation. Therefore, unlike in Pirro and Labate, there is no concern here that the defendants' trial preparations might be hampered by a lack of clarity as to why their conduct was illegal.

For the same reason, the defendants' reliance upon Urso is misplaced. (Cavanagh & Nicolois Mem. at 9). There, the

---

[29]   Further, to avoid the possibility that its reference to "currency reporting requirements" is unclear, Count Six also describes them in detail. See Ind. ¶¶ 36-39.

loansharking statute under which the defendant was charged was particularly vague — one charge in the indictment opaquely stated that the defendant "knowingly and intentionally made extortionate extensions of credit" — making additional factual details necessary.  Urso, 369 F.Supp.2d at 266.  Without such details, the court held, the defendant could not "anticipate the acts and conversations" that constituted the crime.  Id.  By contrast, as explained above, the structuring statute is far more specific, and an indictment tracking it better informs a defendant of the details of the criminal activity alleged.

Notably, Urso was also distinguished by the Galestro court, which found that details regarding the defendant's association with the Bonanno crime family provided sufficient context to protect the defendant's rights.  Galestro, 2008 WL 2783360, at *5.  Similarly, in the present case, the superseding indictment states that Cavanagh and Nicolois were employees of Spongetech, indicating in like manner that the structuring charged in Count Six related to the scheme described in the introduction.

Because the charges against Cavanagh and Nicolois are thus "minimally sufficient," the court may look to the "record as a whole" to ensure that their rights have been protected. E.g., Walsh, 194 F.3d at 45 (holding that discovery materials provided to the defendant clarified the charges against him and

sufficiently protected his rights).  The McGuire Affidavit, which is available to Cavanagh and Nicolois, reveals that 235 checks under $10,000 were cashed, and specifies two dates — February 20, 2008 and March 18, 2008 — on which structuring occurred.  (Metter Ex. 3 ¶ 23).  In addition to the facts in the superseding indictment, these details provide Cavanagh and Nicolois with sufficient notice of the charges to prepare their defense and to avoid double jeopardy in the future.

Cavanagh and Nicolois next claim that the time period alleged in the superseding indictment — "[i]n or about and between January 2008 and December 2009," see Ind. ¶ 41 — is so long as to make the charge impermissibly vague.  This argument is meritless.  First, as is evident from the allegation that the crimes occurred "in the Southern District of New York and elsewhere," Ind. ¶ 41 (emphasis added), there were multiple instances of structuring relating to the Spongetech scheme, all of which are charged in Count Six.[30]  See United States v.

---

[30]    Cavanagh and Nicolois also claim that "[t]he picture is exactly the same with regard to location [sic] of the alleged offenses" — i.e., that because Count Six alleges that the crimes took place "within the Southern District of New York and elsewhere," they could have literally taken place "'anywhere' or 'everywhere.'"  (Cavanagh & Nicolois Mem. at 7).  Notwithstanding that such language is standard for an indictment alleging an ongoing scheme, the government's response to this argument is the same as to the time-interval argument: It is clear that these charges relate to actions taken in connection to Spongetech, and thus are sufficiently particularized.

Tutino, 883 F.3d 1125, 1141 (2d Cir. 1989) ("[A]cts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme.").  Thus it was inevitable that a range of dates would be specified.  Moreover, the Galestro court rejected a similar argument — that prosecutors "alleged 'extraordinarily lengthy time intervals' in an effort to obscure the precise crimes charged," 2008 WL 2783360, at *4 n.3 — and found that intervals of two years were sufficiently specific.  See id. at *4.  As in that case, the allegations about the fraudulent Spongetech scheme sufficiently particularize the charges against the defendants.

     C.   Count Seven Is Not Impermissibly Vague

     Cavanagh and Nicolois argue that the contempt charged in Court Seven fails to provide details about the court order they are charged with violating, and therefore that it is impermissibly vague.  (Cavanagh & Nicolois Mem. at 5-6).  They are wrong.

     It is true that the superseding indictment does not provide "the caption of the case, the docket number, the date the judgment was entered, or the name of the presiding judge." (Id. at 10).  But other details are present.  First, the court — i.e., the "United States District Court for the Southern District of New York" — is specified.  Ind. ¶ 43.  Cavanagh and

Nicolois do not claim to have been subject to any other order from that court, so it should be easy for them to identify the order.

Second, Cavanagh and Nicolois incorrectly focus only on the text of Count Seven, ignoring the factual allegations set forth in the preceding paragraphs.  For example, they claim that "the Indictment does not provide a copy of or any language from" the court order they are charged with violating.  (Cavanagh & Nicolois Mem. at 2).  This is simply not true.  Earlier in the superseding indictment, the order is quoted at length:

> The court also enjoined and restrained
> CAVANAGH and NICOLOIS "directly and
> indirectly, from taking or causing to be
> taken any action to delay, impede or
> obstruct any Commission or [other] [United
> States] Government efforts to locate,
> liquidate, repatriate and pay into the
> [f]und any asset, whether located in or
> outside the United States, and to otherwise
> collect on th[e] judgment."

Ind. ¶ 6 (alterations in original).  And, lest a reader overlook that language, it is expressly incorporated in both of the counts against Cavanagh and Nicolois.  See Ind. ¶¶ 35, 42.  The paragraph quoting the court order also describes other facts relating to the order: "CAVANAGH, NICOLOIS and their company, U.S. Milestone, [were required] to pay approximately $15 million into a court-controlled fund."  Id. ¶ 6.  Thus, it is hard to see how Cavanagh and Nicolois could fail to understand which

order they are charged with violating: It is surely the only order they are subject to that issued from the Southern District of New York, included the language quoted above, and involved them paying the not-easily-forgettable sum of $15 million.

Moreover, assuming there is no other order that fits such a description, there is no concern that the government might try to "fill in elements of its case" at trial.  (Cavanagh & Nicolois Mem. at 6 (quoting Labate, 2001 WL 533714, at *3)). In short, the description of the court order is more than sufficient to save Count Seven from impermissible vagueness.

IV.   <u>EISENBERG'S MOTION TO SEVER SHOULD BE DENIED</u>

   The superseding indictment charges Eisenberg with conspiracy to commit securities fraud (Count One); securities fraud (Count Three); and conspiracy to commit money laundering (Count Five).  Co-defendants Metter, Moskowitz and Tepfer are also charged in these counts.  Eisenberg asks to be severed from the trial of his six co-defendants, arguing that a joint trial will prejudice him for two reasons.  First, he argues that evidence introduced against his co-defendants will result in prejudicial spillover.  Second, he argues that his defense will likely be antagonistic to his co-defendants, in particular Moskowitz.  (Eisenberg's Memorandum of Law at 1) ("Eisenberg Mem.").  For the following reasons, these arguments should be rejected.

   "Joint trials play a vital role in the criminal justice system." <u>Richardson v. Marsh</u>, 481 U.S. 200, 209 (1987). In general, joint trials "serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability." <u>Id.</u> at 210.  They also "conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of a crime to trial." <u>Bruton v. United States</u>, 391 U.S. 123, 134 (1968).

Defendants may be tried jointly "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(c). Under this Rule, "a non-frivolous conspiracy charge," like the one in this case, "is sufficient to support joinder of defendants." United States v. Nerlinger, 862 F.2d 967, 973 (2d Cir. 1988). Proceeding with a joint trial is especially appropriate where, as here, the conduct alleged against all of the defendants arose out of the same fraudulent scheme. See United States v. Girard, 601 F.2d 69, 72 (2d Cir. 1979).

Where there is no misjoinder, a defendant can obtain severance only by showing that prejudice will result from a joint trial. Fed. R. Crim. P. 14(a). Defendants bear the burden of showing "that they will be so severely prejudiced by a joint trial that they would be deprived of a fair trial." United States v. Rucker, 32 F.Supp.2d 545, 549 (E.D.N.Y. 1999). This prejudice must "outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." United States v. Lanza, 790 F.2d 1015, 1019 (2d Cir. 1986). "[A] 'district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" Id. at 548 (quoting Zafiro

76

v. United States, 506 U.S. 534, 539 (1993)).  "Mere allegations
of prejudice are insufficient to meet this burden."  United
States v. Eisenberg, 773 F. Supp. 662, 697 (E.D.N.Y. 1991).
Eisenberg cannot begin to meet this standard.

Eisenberg first raises the possibility of "prejudicial
spillover," claiming that he is charged only as a "minor figure
in the conspiracy," and that evidence against his co-defendants
will unfairly influence the determination of his culpability.
(Eisenberg Mem. at 3-4).  The argument fails.

The Second Circuit has held that a "defendant raising
a claim of prejudicial spillover bears an extremely heavy
burden."  Nerlinger, 862 F.2d at 974.  Even accepting
Eisenberg's contention that his co-defendants played a larger
role, a "disparity in the quantity of evidence and of proof of
culpability are inevitable in any multidefendant trial, and by
themselves do not warrant a severance."  United States v.
Cardascia, 951 F.2d 474, 483 (2d Cir. 1992).  Indeed, "the fact
that evidence may be admissible against one defendant but not
another does not necessarily require severance."  United States
v. Carson, 702 F.2d 351, 367 (2d. Cir 1983) (citations omitted).
Juries are strongly presumed to be capable of following judges'
instructions in sorting out what evidence bears on the guilt of
any single defendant, Zafiro, 506 U.S. at 540, and even where a
joint trial carries a high risk of prejudice, "less drastic

77

measures — such as limiting instructions — often suffice as an alternative to granting a Rule 14 severance motion." United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003).

Eisenberg next argues that parts of the trial will be focused on co-defendants' criminal acts, such as lying to the SEC, with which he is not charged.  This claim is of no moment.  What matters is that Eisenberg is charged with the central counts of the superseding indictment: conspiracy to commit securities fraud, securities fraud and conspiracy to commit money laundering.  To prove the fraudulent Spongetech scheme, the government will offer evidence of acts in which Eisenberg participated directly.  Specifically, the superseding indictment describes several corporate entities controlled by Spongetech — such as Asset Management, see Ind. ¶ 18 — that acted as conduits for the sale of fraudulently unrestricted Spongetech stock.  Eisenberg was the president of Asset Management.  Id. ¶ 10.  Thus the financial records of Spongetech and these other entities, as well as bank records, emails, and other documentary evidence, will be offered against both Eisenberg and his co-defendants.

It will be straightforward for the jury to isolate evidence related to the charges against Eisenberg's co-defendants — the perjury and obstruction counts against Metter, Moskowitz and Speranza, and the structuring and contempt counts

against Cavanagh and Nicolois — which all involve discrete individual acts.  Finally, the government expects to introduce evidence showing that Eisenberg received a significant amount of money from the scheme, casting doubt on his assertion that his role was "minor."  (Eisenberg Mem. at 1).  Thus Eisenberg is unlikely to be prejudiced at trial, and certainly not to the extent that severance is warranted.

Eisenberg's citations do not support his argument. United States v. Bellomo (Eisenberg Mem. at 3) involved motions to sever several defendants involved in a gambling scheme.  954 F. Supp. 630, 648-52 (S.D.N.Y. 1997).  The district court in that case severed the trials of defendants who were not charged with participating in the enterprise on which the trial would focus, concluding that evidence related to the enterprise would prejudice them.  Id. at 650.  By contrast, Eisenberg worked at Spongetech and was the president of another entity involved in the fraudulent scheme.  The counts against him are at the heart of this case; evidence offered to prove the existence of the scheme will necessarily bear on his culpability.  Indeed in Bellomo, the court refused to sever several other defendants who had participated in the enterprise — even though they were "not named in the most serious charges in the indictment" — because, as here, evidence related to the enterprise was relevant to the charges against them.  Id. (noting that a jury "instruction will

79

be sufficient to counteract any spillover prejudice from the charges against the other defendants"). Therefore, under Bellomo, severance is especially inappropriate in this case because Eisenberg is charged with the central counts in the superseding indictment and was active in the charged scheme.

United States v. Maisonet (Eisenberg Mem. at 3), a drug case, also involved the severance of defendants not charged with the most important crimes related to the enterprise. No. S3 97 CR. 0817 (DC), 1998 WL 355414, at *4-7 (S.D.N.Y. Jul. 1, 1998). Although, as here, the severed defendants were part of the same scheme as their co-defendants, the district court in that case cited numerous factors not present here to support its severance determination. They included the "unique concerns presented by . . . death penalty-eligible counts charged in the indictment" and the natural division of the trial between defendants charged under the Racketeer Influenced and Corrupt Organizations ("RICO") Act and those not. Id. at *4-5. Here, the risk of prejudice from co-defendants' actions is minimal, since the counts against Eisenberg are central to the scheme and no categorically more serious crimes are charged. Further, there is no natural division of defendants or charges. Rather, as described above, the evidence offered to prove the existence of the scheme will bear on all of the defendants' charges, including Eisenberg's.

Eisenberg has thus failed to show any spillover prejudice that will result from his being tried jointly with the co-defendants, let alone any prejudice that can overcome the strong presumption for joint trials.

Finally, Eisenberg contends that because his defense is antagonistic to Moskowitz, a joint trial will give rise to substantial prejudice.  He claims that because he will assert at trial that "any actions he took were unknowing and done at Moskowitz's insistence, . . . to acquit Eisenberg, it would be necessary for a jury to find Moskowitz guilty."  (Eisenberg Mem. at 4).  Eisenberg is wrong.

In Zafiro v. United States, the Supreme Court held that "[m]utually antagonistic defenses are not prejudicial per se."  Zafiro, 506 U.S. at 538.  Since that decision, the Second Circuit has consistently rejected arguments that severance was required due to antagonistic defenses. See United States v. Diaz, 176 F.3d 52, 103-04 (2d Cir. 1999); United States v. Salameh, 152 F.3d 88, 116-17 (2d Cir. 1998); United States v. Haynes, 16 F.3d 29, 32 (2d Cir. 1994); United States v. Harwood, 998 F.2d 91, 95-96 (2d Cir. 1993).  Furthermore, after Zafiro, courts in this district have generally exercised their discretion by denying severance motions based on antagonistic defenses.  See, e.g., United States v. Mahaffy, 446 F.Supp.2d 115, 122-23 (E.D.N.Y. 2006); United States v. Schlegel, No. 06-

CR-0550 (JS), 2009 WL 3837305, at *3-4 (E.D.N.Y. Nov. 16, 2009);
United States v. Kahale, No. 09-CR-159 (KAM), 2010 WL 456860, at
*3 (E.D.N.Y. Feb 3, 2010).

It is "axiomatic that the 'mere presence of hostility
among defendants or the desire of one to exculpate himself by
inculpating another [are] insufficient grounds to require
separate trials." United States v. Potamitis, 564 F. Supp.
1484, 1487 (S.D.N.Y. 1983) (quoting United States v. Ehrlichman,
546 F.2d 910, 929 (D.C. Cir. 1976) (alteration in original)).
"The mere fact that codefendants seek to place the blame on each
other is not the sort of antagonism that requires a severance."
United States v. Villegas, 899 F.2d 1324, 1346 (2d Cir. 1990)
(citing United States v. Casamento, 887 F.2d 1141, 1154 (2d Cir.
1989)). Instead, "the defenses must conflict to the point of
being so irreconcilable as to be mutually exclusive" for
severance to be warranted. Cardascia, 951 F.2d at 484. This
standard is met only "if, in order to accept the defense of one
defendant, the jury must of necessity convict another
defendant." Id. Courts are naturally hesitant to grant motions
for severance based on antagonistic defenses, lest "a virtual
ban on multidefendant conspiracy trials [] ensue since co-
conspirators raise many different and conflicting defenses."
Id. As a result, a defendant must show "as a matter of logic"
that his defense cannot co-exist with that of a co-defendant.

Villegas, 899 F.2d at 1346-47; see also United States v.
Basciano, No. 05-CR-060 (NGG), 2007 WL 3124662, at *9 (E.D.N.Y.
Oct. 23, 2007) (granting severance where defenses were logically
irreconcilable); United States v. Copeland, 336 F.Supp.2d 223,
225 (E.D.N.Y. 2004) (same).  Eisenberg cannot meet this
standard.

Eisenberg's argument is much like the one rejected by
the district court in United States v. Moody, 660 F.Supp.2d 340
(D. Conn. 2009).  In that case, a defendant was indicted along
with two others for conspiracy to commit bank fraud.  Id. at
342.  He moved for severance because he claimed his defense
would seek to establish that a co-defendant had been the actual
participant in the scheme; he also surmised that the co-
defendant might attempt to implicate him, in turn.  Id. at 343.
The court rejected his motion, concluding:

> A jury's determination that [the co-
> defendant] was not involved in the charged
> conspiracy does not mandate a finding of
> culpability of [the defendant] and vice
> versa.  The jury could find both defendants
> were conspirators, or only one, or neither,
> i.e., a conspiracy only among [a third
> defendant] and the other co-conspirators not
> named in the indictment, or could find no
> conspiracy as charged.

Id. at 344.  Just so here.  To find that Eisenberg was innocent
of the crimes for which he was charged, even based on his theory
of defense, would not "mandate a finding" that Moskowitz was

83

guilty, or vice versa.  Eisenberg calls it "not unreasonable to surmise" that Moskowitz might blame his subordinates — including Eisenberg — for the alleged crimes. (Eisenberg Mem. at 4).  But that is not the standard.  "As a matter of logic," Eisenberg has not shown that his defense and Moskowitz's will be mutually exclusive.  Rather, as in Moody, the jury could find that both of them — or one, or neither — participated knowingly in the scheme.

Thus Eisenberg merely raises the possibility of "fingerpointing," which courts have consistently rejected as a basis for severance.  Villegas, 899 F.2d 1324 (quoting Casamento, 887 F.2d at 1154).  Any prejudice that occurs would be of a kind that is expected when multiple defendants are tried together, and does not rise to the level necessary to overcome the presumption in favor of joint trials.  The Court should deny Eisenberg's motion.

CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court deny the defendants' motions, except with respect to Count Seven, which should be dismissed without prejudice.[31]


Dated:      Brooklyn, New York
            July 25, 2011

                                    Respectfully submitted,

                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York


                        By:    _____/s/_____
                                    Roger Burlingame
                                    Assistant U.S. Attorney


CC:        Defense Counsel (via ECF)

---

[31]   The government gratefully acknowledges the significant contributions of Charles P. Griffin, a second-year law student at Harvard Law School, and Andrew Hahn, a second-year law student at Yale Law School, in the preparation of this brief.