UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>-against-<br><br>MICHAEL METTER, STEVEN MOSKOWITZ, ANDREW TEPFER, also known as "Avi," SEYMOUR EISENBERG, also known as "Jimmy, " GEORGE SPERANZA, THOMAS CAVANAGH, and FRANK NICOLOIS,<br><br>        Defendants. | **1:10-cr-0600-DLI** |

**DEFENDANT METTER'S REPLY MEMORANDUM IN SUPPORT
OF MOTIONS TO DISMISS AND MOTIONS TO SUPPRESS**

**HINSHAW & CULBERTSON LLP**
**780 Third Avenue, 4th Floor**
**New York, NY 10017**
**Tel:  212-471-6200**
**Fax: 212-935-1166**
*Attorneys for Defendant Michael Metter*

## <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT.................................................................................................1

STATEMENT OF FACTS ....................................................................................................5

    A.  Facts Regarding the Handling of Seized Materials and the Claimed
        "Foot Dragging" of the Defense ....................................................................5

    B.  Facts Relating to the Charge of Perjury ......................................................9

ARGUMENT ......................................................................................................................9

    POINT I:
             THE COURT SHOULD SUPPRESS THE SEIZED MATERIALS
             OR CONDUCT A HEARING TO DETERMINE THE ACTUAL
             CONDUCT RELATING TO THE SEIZED MATERIALS...................................9

        A.  The Government Has Failed to Comply with the Search
             Warrants within a Reasonable Time................................................10

        B.  The Email Warrant is Overbroad....................................................14

        C.  If the Email Warrant is Limited, the Government Has
             Failed to Comply with it Within a Reasonable Time......................15

    POINT II:
             THE COURT SHOULD DISMISS THE PERJURY COUNT .............................16

        A.  The Indictment is Facially Defective .............................................16

        B.  Because the Offense was Committed in the District of Columbia,
             Venue Does Not Lie in the Eastern District of New York ...........................17

CONCLUSION..................................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

CASES:

United States v. Abdellatif,
    2010 WL 5252852 (W.D.N.Y. 2010) ................................................................ 9-10

United States v. Burns,
    2008 WL 4542990 (N.D.Ill. 2008) ....................................................................12

United States v. Cabrales,
    524 U.S. 1 (1998).................................................................................................18

United States v. Comperehensive Drug Testing,
    621 F.3d 1162, 1177 (9th Cir. 2010) ...................................................................9

United States v. Clark,
    1987 WL 13273 (S.D.N.Y. 1987)...........................................................17, 20, 21

United States v. Debbi,
    244 F.Supp.2d 235 (S.D.N.Y. 2003)...................................................................10

United States v. Gorrell
    360 F. Supp. 2d 48 (D.D.C 2004) .......................................................................12

United States v. Hernandez,
    183 F.Supp.2d 468 (D.P.R. 2002).......................................................................12

United States v. Manfredi,
    789 F. Supp. 961 (D. Ind. 1992) .........................................................................17

United States v. Mann,
    592 F.3d 779, 786 (7th Cir. 2010) .....................................................................15

United States v. Mutschelknaus,
    564 F. Supp. 2d 1072 (D.N.D. 2008).............................................................1, 12

United States v. Novak,
    443 F.3d 150 (2d Cir. 2006).........................................................................16, 17

United States v. Reed,
    773 F.2d 477 (2d Cir. 1985).....................................................................17, 18, 21

United States v. Saavedra,
    223 F.3d 85 (2d Cir. 2000)..................................................................................18

United States v. Syphers,
 426 F.3d 461 (1st Cir. 2005)..................................................................................12

United States v. Triumph Capital Group, Inc.,
 211 F.R.D. 31 (D. Conn. 2002)................................................................................1

United States v. Tzolov,
 642 F.3d 314 (2d Cir. 2010)..............................................................................19, 20

United States v. Williams,
 592 F.3d 511 (4th Cir 2010) ..................................................................................3

**STATUTES:**

18 U.S.C. § 1621 ....................................................................................................4

18 U.S.C § 1623 ...................................................................................................18

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-against-

MICHAEL METTER, STEVEN
MOSKOWITZ, ANDREW TEPFER, also
known as "Avi," SEYMOUR EISENBERG,
also known as "Jimmy, " GEORGE
SPERANZA, THOMAS CAVANAGH, and
FRANK NICOLOIS,

Defendants.

**1:10-cr-0600-DLI**

---

## DEFENDANT METTER'S REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND MOTIONS TO SUPPRESS[1]

### Preliminary Statement

In its opposition to the motion to suppress, the Government acknowledges that it is required to conduct, but has not even begun, a review of the seized materials to determine that which is within the scope of the search warrants.[2] The Government claims that it has not begun that process because it is "waiting" to complete an attorney-client privilege review, supposedly

---

[1]    Defendant Tepfer joins in the motion to suppress materials seized from Spongetech.

[2]    To differentiate the review for privileged materials from the review that would be necessary to comply with the warrant, this memorandum will refer to the latter as the "search warrant review." The Department of Justice's Search and Seizure Manual has a straightforward description of this search warrant review process.

> After imaging, the second step of the forensic review process begins: the hard drive image is examined, and data that falls within the scope of the warrant is identified. In computer search cases, where the purpose for the off-site analysis is to determine whether information stored on computer media falls within the scope of a warrant, courts have treated the off-site forensic analysis of computer media seized pursuant to a warrant as a continuation of the search, still bound by the Fourth Amendment. See United States v. Syphers, 426 F.3d 461, 468 (1st Cir. 2005) (referring to a forensic review of a seized computer as a "search"); United States v. Mutschelknaus, 564 F. Supp. 2d 1072, 1076 (D.N.D. 2008) (referring to forensic analysis as a "subsequent search"); United States v. Triumph Capital Group, Inc., 211 F.R.D. 31, 66 (D. Conn. 2002) (referring to an examination of a hard drive image as a "search").

Exhibit 12 to Fritz Affirmation, Computer Crime Manual, at 17 of 35.

1

delayed by the "foot dragging" of the defense.   Government's Omnibus Response ("Govt. Mem.") at 31.  See also Govt. Mem. at 22-23.[3]

These arguments are advanced by those who were not involved in the many months of discussions of the seized materials, and who appear assiduously to ignore the statements and conduct of the prior Assistant United States Attorney ("AUSA") who repeatedly made clear that he was not "waiting" to conduct a search warrant review.   To the contrary, he appeared to reject any notion that the Government was required to forensically analyze the seized materials to comply with the search warrants.   He consistently and plainly stated that the entirety of the material seized was the "Government's evidence," and that the Government could exercise control over that material, including computers from Mr. Metter's home, in a strikingly invasive way, *i.e.,* by simply distributing the contents of those hard drives – without reviewing it -- to all counsel in this multi-defendant case.   He acknowledged only the obligation to remove attorney-client privileged materials, and discussed a further review of the seized materials only in the context of his desire to search for usable evidence in "preparation for trial," not as an essential component of compliance with the search warrants.   The Government's claim that the prior AUSA was "waiting" to conduct a search warrant review, and its attempts to lay blame on the defense, are entirely unsupported by this record.

It appears, instead, that the Government has simply changed its position.   The Government now acknowledges that it must go through the search warrant review process, analyzing the hard drives to identify the materials that are within the scope of the warrant.[4]  But

---

[3]   For example, the government claims that "the reason the files have not yet been reviewed is due to the defendant's failure to provide the government with the information necessary to" conduct the attorney-client privilege review.  Govt. Mem. at 22-23, 28.  As detailed below, that supposed delay would have begun six months after the seizure, and would account for roughly two of the last fifteen months.

[4]   It remains unclear whether the Government acknowledges that, at the conclusion of that process, it is required to produce those relevant materials to the defense and divest itself of that which it was not entitled to seize

130155542v1  0916527 74387

the government fails to provide the Court with the precise information that would be needed for resolution of this motion: the length of time that will be required to begin -- and complete -- that search warrant review.  The Government argues that a fifteen month delay in reviewing the seized material is "not unreasonable" and not impermissible.  In support of that position, the government has cited cases in which the *completion* of a forensic review took as long as ten months.  But no court has ever held that a delay of more than a year in beginning the search warrant review, such as already exists in this case, is "reasonable."  And the existing delay is certainly only the beginning, since the search warrant review has not even begun.  None of the cases cited by the government support the view that it can simply fail to conduct a review for well over a year, and then take another period of ten or twelve months to conduct the review necessary to comply with the warrants.

The Government also attempts to absolve itself by emphasizing that it has never looked at the seized materials.  But that assertion only underscores the problem: the government seized information only because it was empowered to do so by particular search warrants.  It then announced its intention to expose that kind of personal and confidential material to third parties, without even acknowledging that it was only lawfully entitled to possession of that which was within the scope of the warrants.  The Government is not permitted to conduct an overbroad seizure, and then retain and/or disseminate that information, while claiming that it has done no wrong because it itself never bothered to look at it.

---

in the first place.  The government certainly states in its brief that it intends to search the hard drives "for evidence of the alleged crimes," perform an "analysis of the hard drives and emails," and perform a "forensic examination of the hard drives." Govt. Mem. at 13, 19- 21.  The Government does not expressly acknowledge that, aside from simply looking for evidence that it wants to use at trial, it has separate obligations to then produce that which is within the warrant and dispose of the remainder.  See United States v. Williams, 592 F.3d 511, 520 (4th Cir 2010) (if "documents not covered by the warrant are improperly seized, the government should promptly return the documents or the trial judge should suppress them").

By virtue of its conduct, the Government has prejudiced both the case and the defendants. This Court stated early on that it "did not want to spend two years just trying to figure out" what was on the hard drives (Exhibit 11 to Fritz Affirmation: Transcript of Proceeding of February 4, 2011 ("Tr.") at. 22), but that is the situation that now exists.  At this point, the Court has no information regarding how much longer the attorney-client privilege review will take, or the time that will then be required to conduct the search warrant review to comply with the search warrants.  The defendants are plainly prejudiced not only by the delay that will result from the Government's failure to proceed with compliance with the warrants, but also because the Government's conduct threw onto the defense the burden of devoting its own time and resources to efforts to prevent the impermissible dissemination of material that is plainly beyond the scope of the warrants.

Based on these circumstances, the defense argued that the Court should order suppression of all evidence that the Government cannot, at this point, demonstrate was within the scope of the warrants.  In the alternative, because the Government's response relies so heavily on factual assertions that are unsupported by – and even contradicted by -- the record, a hearing is required to determine exactly what occurred with respect to the seized materials.

The issues relating to the defendant's motion to dismiss are much easier to resolve.  The Government here proceeded under a particular statute that addresses conduct obstructive of an *investigation* – as opposed to the statute dealing with conduct obstructive of a court proceeding. 18 U.S.C. § 1621.  In the indictment, the government specifically defined the investigation that was allegedly obstructed:  the SEC's investigation.  No allegation has been made that any of the testimony taken in the SEC proceeding, occurring in October 2009, actually impeded any subsequent proceeding, and it seems fairly clear that it did not.  The Government, in its response,

4

ignored these facts, discussing the issue as if it the defendant's testimony arose in the context of an "ancillary" proceeding.  It did not; the indictment charges a different crime, and the perjury count should be dismissed.

## STATEMENT OF FACTS

**A.    Facts Regarding the Handling of Seized Materials and the Claimed "Foot Dragging" of the Defense**

Because the government's opposition fails to acknowledge many of the events that occurred prior to the assignment of this new Assistant United States Attorney, it is necessary to briefly recap those events.

In May 2010, the government obtained and executed the search warrants at issue on the offices of Spongetech and the home of Mr. Metter.  Those search warrants, while broad, authorized seizures of specific categories of materials.  Exhibits 4 and 5 to Fritz Affirmation at Attachment A.  Pursuant to those search warrants, the government seized all of the 61 hard drives from the offices of Spongetech and RM Enterprises, and four computers from the home of Mr. Metter, computers that contain personal and business information that is well outside the scope of the search warrants. Fritz Affirmation at ¶ 14.

During the six month period following the seizures, the government apparently took no steps to conduct a forensic review of any of the seized electronic materials.[5]

The first action by the government relating to the seized materials apparently occurred at a conference before this Court on November 22, 2010, approximately six months after the seizures.  The government at that point stated that it intended to conduct a search for attorney-client privileged materials, and that it intended to contact defense counsel to obtain

_____

[5]  There is some question as to whether investigators had looked at the seized materials in 2010.  According to the Affidavit of Thomas McGuire, executed November 1, 2010 in support of the application for email search

130155542v1  0916527  74387

"search terms so that we can process the computers." Tr. 6.  The Court noted that "it sounds like the government has not thought through what you're going to do when you encounter attorney privileged documents, whether you're going to set up a privilege team that will deal with any privileged documents." Tr. 7.  The Court set a further status conference for February, and asked that the government provide a status report in advance of that conference "as to what the government's planning to do with respect to any privileged documents." Tr. 12-13.

By letter dated January 25, 2011, the government provided a status report to the Court that made no mention of any attorney-client review process, or any process to accomplish compliance with the warrants that were the basis for the seizures. Instead, the Government again announced its intention to "make available for copying all computers seized during the investigation." Letter dated January 25, 2011 [Doc. 87].

At the conference on February 4, 2011, the AUSA reiterated his intention to simply copy, for all defendants, all contents of the seized hard drives and email accounts "within the next four weeks." Tr. 7-8.  Counsel objected to the government's intention to disseminate the seized materials without a privilege review or any determination of whether the materials were within the scope of the warrant.  Tr. 9.  The Court again asked the Government about a taint team, saying that it "should have been addressed initially when these items were first seized."  Tr. 12. The Court asked the government "what steps have been taken to putting together a taint team," adding that the Court "thought this was going to be done in this interim."  Tr. 18.

In response, the government stated that it had sent a letter to defense counsel, on December 27, 2010, requesting "attorney names or associates of attorneys to do a filter team before we review those documents."  The Government then stated that, because it received a

---

warrants, the "hard copy" documents had been reviewed and the review of seized electronic files had "not yet been completed."  Fritz Affirmation at Exhibit 8, ¶ 80 n.23.

130155542v1  0916527 74387

response from only one attorney, it was entitled to simply proceed with its own review of the hard drives.  As stated by the AUSA, "as far as the Government is concerned, we met our obligation to get this information prior to reviewing these computers."  Tr. 20.

When the Court then pressed the government regarding the length of time it would take to conduct the privilege review, the AUSA once again insisted that the privilege review was "a separate issue" from discovery to the defense "because we are intending to turn over to defense attorneys everything we seized before we look at it regardless of whether it had anything privileged on it."  Tr. 24.  According to the AUSA, "the privilege issue is simply for our preparation for trial" and so did not affect his ability to disseminate to all defense counsel all of the seized items, whether from the Spongetech offices or from Mr. Metter's home.  Tr. 24.

Asked by the Court to clarify whether the Government was actually going to turn over "all of those computer hard drives and documents without having reviewed it,"  the AUSA answered "yes." Tr. 24.   As described by the Court, "the Government's response just seems to be, okay, I'm going to throw everything out there and you guys sort it out because we haven't looked at it." Tr. 25-26.

The defense objected to the wholesale dissemination of the seized materials not only because of privileged material but also because the computers contain irrelevant and personal material that is not within the scope of the warrant.  Tr. 24-25, 27.

The AUSA continued to insist that he could "turn[] over all the materials."   He described all of the seized material as the "government's evidence" and insisted that all defendants were "entitled" to receive all of it.  Tr. 29.

At no time did the AUSA agree that the Government had any obligation to conduct any review of the scope of the seized materials to ensure compliance with the search warrants.

130155542v1  0916527  74387

Confronted with the Government's stated intention to distribute all of the seized materials, regardless of their contents, the defense finally proposed that the Government be required to provide copies of certain hard drives to particular counsel before any such wholesale production. The defense also stated its position that the government had seized materials that were "well outside the scope of the warrant." Tr. 36. The Court stated that the issue would be addressed by motion. Tr. 37. In the meantime, "since the Government's going to be turning it over without first having looked at it, then that's why it's going to be up to the defense then to say, well, we think that this falls under a spousal privilege." Tr. 38.

As directed by the Court, the defense, a week later on February 11, 2011, provided the list of attorneys and law firms that were providing legal advice to those who used the seized computers.

On or about February 28, 2011, the AUSA provided another status report to the Court. Again, the government stated its intention to turn over to all defendants all contents of the hard drives, except to the extent that defense counsel would be permitted to review some of the hard drives and try to locate and point out to the government privileged or irrelevant materials. Letter dated February 28, 2011 [Doc. 101].

The February 28th letter also stated that the government would use a filter team for the purpose of conducting a privilege review. It had not begun that process, however, and stated that the defense should provide additional information "so that the filter team can assess *the validity of the privilege* and whether any exception, such as the crime fraud exception, applies." (Emphasis added).

At a subsequent conference on April 8, 2011, the Court directed the defense to provide additional information regarding the attorneys whose names had been provided to the

Government in February.  That additional information was provided two weeks later, on April 22, 2011.  According to the government's brief, it was then – almost one year after the seizures – that the attorney-client privilege review began.  Govt. Mem. at 15.

**B.     Facts Relating to the Charge of Perjury**

Count Nine of the Indictment specifically states that the defendant, at his testimony before the SEC in Washington D.C., allegedly interfered with the investigation being conducted by the SEC in Washington D.C.   There were no ancillary proceedings at that time, or for a period of more than six months thereafter.  The Indictment does not allege that the perjury, in any way, obstructed the subsequent court proceedings.

**ARGUMENT**

**POINT I**

**THE COURT SHOULD SUPPRESS THE SEIZED MATERIALS
OR CONDUCT A HEARING TO DETERMINE THE ACTUAL
CONDUCT RELATING TO THE SEIZED MATERIALS**

The government spends a great deal of time in its opposition reciting precepts that are not in dispute.  The defense agrees that the courts do not yet require a search protocol to be contained in the application for a warrant. The courts do not yet dictate to the agents the procedures to be employed in the seizure and removal of electronic data, or the particular methodology that has to be employed in the subsequent forensic analysis.

But the principles on which the defense relies are equally clear and compelling: The seizure of all of one's electronic files involves a "degree of intrusiveness much greater in quantity" than other searches, and "calls for greater vigilance," not less.   United States v. Comprehensive Drug Testing, 621 F.3d 1162, 1177 (9th Cir. 2010); United States v. Abdellatif,

9

2010 WL 5252852 at *5 (W.D.N.Y. 2010). The Government is permitted to engage in an overbroad seizure of electronic data *for the purpose* of then conducting its search to comply with the warrant, but that authorization carries with it the responsibility to then conduct the review within a reasonable time, identify that which is within the scope of the warrant, and return that which is beyond the scope of the warrant. That authorization to seize a broader scope of material for a subsequent search should not be employed as a basis "to blatantly disregard the very limitations that saved the warrant from overbreadth." United States v. Debbi, 244 F.Supp.2d 235, 237 (S.D.N.Y. 2003).

### A. The Government Has Failed to Comply with the Search Warrants within a Reasonable Time.

Here, the record reflects that the government made its own deliberate decision to proceed by way of search warrants. Pursuant to the specific authority contained in those search warrants, it seized a substantial volume of office and home computers. It then retained that data for at least a year without even acknowledging its obligation to conduct the forensic analysis necessary to accomplish compliance with the warrants. Instead, the government repeatedly stated that it intended to disseminate all of the seized materials, plainly reflecting its position that it could access and distribute even the personal information from Mr. Metter's home computers to all the other defendants. As a result, more than a year passed without any substantial steps being taken by the Government to comply with the warrants.

Now, the Government is arguing that it was only "waiting" to conduct a search warrant review of the seized data.[6] According to the newly assigned AUSA, the Government needed to

---

[6] The Government claims, for example, that "investigators believed that they would be better able to search for evidence most effectively after the filter team isolated the attorney-client privileged documents." Govt. Mem. at 28. First, that phrasing certainly suggest that the government had made a tactical decision rather than being unable to proceed. Further, that claim is unsupported by anything in the record.

10

complete the privilege review, a process that the government claims was delayed by the defense. The government even claims that this Court "authorized" this delay in the search warrant review, and that the defense agreed that an attorney-client review would be performed prior to the forensic analysis.  Govt. Mem. at 28.

Those contentions are inconsistent with the positions taken and statements made by the prior AUSA who was handling the case, and the chronology of events relating to the seized materials.  Neither the Court nor the defense ever acceded to the delay in conducting a search warrant review, in part because the government never acknowledged any obligation to conduct a search warrant review and made plain that it was not undertaking any review of the materials except in its own "preparation for trial." Tr. 24.

Further, had the Government been of the view that an attorney-client privilege review was an essential first step in its compliance with the search warrant, it certainly would have either commenced its own review for privileged files, or promptly sought the information from defense counsel to do so.  It did not.  For six months, it did nothing.  It then sought and received the listing of counsel, and still did nothing, claiming that it was entitled to more information to "assess the validity" of the privilege.  It then received that additional information, and an attorney-client privilege review apparently began.  Now, four months later, that attorney client privilege review is not completed, and the essential review for compliance with the warrants has not begun.

In support of the argument that its treatment of the seized materials is "not unreasonable," the government cites cases in which the actual searches of computerized data took many months. Govt. Mem. at 20.  The government then seeks to persuade the Court that the period of time during which it was ***not*** reviewing those hard drives should be considered a reasonable period of

11

time in which to conduct that search.   Those cases are, however, inapposite.  In those cases, the Government had conducted an analysis of the scope of the seized data, but the analysis took some time.  None of those cases state that a one year delay prior to even beginning the forensic analysis of the scope of the seizure, in order to comply with the warrant, is acceptable.

The cases cited by the government also emphasize that, while wholesale seizures are permitted, and the "normal sequence of search and seize is turned on its head," that process must be scrutinized to ensure compliance with the warrant.[7]  In United States v. Syphers, 462 F.3d 461 (1st Cir. 2005), the court held that a five month delay was not excessive, but in that case the authorities had actually petitioned the government for authorization to retain the computer for a year because of the backlog in forensic analysis.  Id. at 463.  No such acknowledgement of any delay, or the obligation to comply with the warrant, occurred in this case.

In United States v. Burns, 2008 WL 4542990 (N.D.Ill. 2008) at *8-*9, the court noted that "a delay must be reasonable," but then held that a "lengthy" period of ten months was not impermissible given the demands on the resources of Homeland Security.  Similarly, in United States v. Gorrell, 360 F. Supp. 2d 48 (D.D.C 2004) the government completed its processing in ten months, a period that the court held was "lengthy" but did not require suppression.

Here, we are not dealing with only a fifteen month delay.  We are dealing with a failure even to begin the search warrant review within fifteen months.  The government has provided no information to the Court regarding when the search warrant review process will begin or how long it is expected to take.  It has taken no responsibility for its failure to comply with the search

---

[7]   The government also cites three other cases for the general proposition that there "is no upper limit on reasonableness."  Govt. Mem. at 20.  First, that seems a difficult proposition; if the search must be completed within a reasonable period of time, then there plainly is some limit.  Further, both United States v. Hernandez, 183 F.Supp2d 468 (D.P.R. 2002) and Mutscelkaus involved periods of two months, and the authorities had actually sought and obtained from the court approval for that particular period of time.  564 F.Supp.2d at 1077.

12

warrants, relying instead on distortions of the chronology to try to blame the defense.  At the same time, it is clear that the privilege review has taken more than four months, and the review to identify documents within the scope of the warrant will presumably be a far more complex process.  It therefore is reasonable to assume that we are likely to encounter an even longer period of processing to complete the search warrant review in this case, with the result that the Government's execution of the warrant will have taken two years or more.

The Government argues also that the Court should impose no remedy because it has not yet attempted "to introduce unlawfully seized material" or even look at it.  Govt. Mem. at 29-30.[8] That contention sounds remarkably similar to the position of the former AUSA on the case, *i.e.*, that the Government can conduct an overbroad seizure, eventually cull out and use at trial any selected materials that it finds to be useful, never conduct an actual process to accomplish compliance with the warrants, and suffer no consequence.  Under the Government's theory, the fact that it seized and kept (and even tried to disseminate) material that it had no right to seize somehow ends up being irrelevant and irremediable.  If that is the law, then suffice it to say that overbroad seizures will become the norm, and compliance with a warrant will become an unnecessary annoyance.

---

[8]  According to the Government, the actual seizure of one's personal data cannot be considered a "general search" until the government actually looks at it. Govt. Mem. at 30-31.

**B.      The Email Warrant is Overbroad**

The circumstances relating to the seizure of Mr. Metter's email account are clear: The Government sought and obtained a warrant that permitted the seizure of "all" of Mr. Metter's emails, it obtained that entire email account, it conducted no forensic review to limit the seizure, and it again sought to disseminate the entire account regardless of its content.

The Government argues that its warrant was particularized because it "limited  the scope of the government's search to emails containing evidence of crimes."  Govt. Mem. at 34.  The government claims that the warrant is sufficiently particular because it "specifies the crimes that Metter committed, referring to precise statutory provisions."  Govt. Mem. at 38.  Therefore, an agent executing the warrant "would have understood clearly … that the search was limited in scope by the statutory provisions listed."  Govt. Mem. at 38-39.

The Government's argument is, however, inconsistent with the warrant and with its own actions.  The warrant is plainly not limited to evidence of those alleged crimes.  It repeatedly affirmatively states that "all" of the email files constitute evidence of those crimes – a very different assertion.  Exhibit 9: Search Warrant and Attachment A-1.  Had the Government sought or intended to seize only the items that relate to the alleged criminal activity, or that constitute evidence of the alleged crimes, it would have been a simple matter of identifying those items on the Attachment – just as it did in relation to the earlier search warrants.  Instead, the government deliberately sought and obtained authorization to seize the entire email account, "all of which constitute evidence" of the alleged crimes, and announced its intention to produce those emails to all defendants, without any mention of a process to identify a subset relating to the alleged crimes.

The Government complains that, by citing the plain language of the warrant, the defense is being overly formalistic, but the Government fully understands the need for precision in relation to a seizure of communications, it is fully aware of the means by which to particularize its requests, and it did not do so in relation to these warrants.  Nor did it follow the seizure of all emails with a forensic review to narrow the scope of the seizure.  Both the precise language of the warrant, and the subsequent conduct of the Government, support the position that the warrant is overbroad.

## C.    If the Email Warrant is Limited, the Government Has Failed to Comply with it Within a Reasonable Time

Assuming that the Government is correct – and the search warrant somehow limits the seizure to evidence of specified crimes – the same issue exists with respect to execution of that warrant: did the Government take the necessary steps to comply with the warrant.  And again, it appears that the government has not conducted a review to comply with the warrant, nor does it appear to acknowledge that it is required to do so.  Rather than representing that such a process had or would occur, the Government argues that whether it seized other documents is "irrelevant" because it is allowed to look at unrelated documents to find the ones that are within the warrant.  Govt. Mem. at 43.[9]   The Government's position entitles it to engage in an overbroad seizure and then simply sift through the materials without any actual compliance with the warrant that authorized the seizure.   In other words, according to the Government, even the

---

[9]    According to even those cases cited by the government, the government is obligated "to exercise caution to ensure that warrants describe with particularity the things to be seized and that searches are narrowly tailored to uncover only those things described."  United States v. Mann, 592 F.3d 779, 786 (7th Cir. 2010).  It is permitted to "cursorily" examine materials to determine if they fall within the warrant, and then cease its review as soon as it is able to determine that the document is not within the warrant.  The extent to which the government may rely on a plain view exception to then seek to use material not within the scope of the warrant depends, in part, on the precision of its search methodology.

most particularized warrant allows seizure of everything, and review and retention of even the most extraneous materials.

Notably, the Government also considers itself immune from suppression because, although it seized and kept irrelevant documents, Mr. Metter was not "denied access" to those same electronic files. Govt. Mem. at 43. Again, that claim is troubling at best: according to the Government, it is entitled to engage in a plainly overbroad seizure as long as the material is copied. That turns on its head the fundamental nature of a search warrant: a court has permitted seizure of only that which is within the scope of that warrant, and not all of the personal and confidential information that is so often contained on a personal, or even an office computer.

## POINT II

### THE COURT SHOULD DISMISS THE PERJURY COUNT

**A.    The Indictment is Facially Defective**

The Government's brief includes a clear and comprehensive iteration of precisely the authority that establishes that this perjury count must be dismissed. As discussed at some length by the Government, its indictment should survive so long as "it has alleged sufficient facts in the indictment to support a finding that venue is proper." Govt. Mem. at 49. Under that analysis, Count Nine must be dismissed: the count alleges only the events in Washington D.C. and does not allege, even conclusorily, that any conduct occurred in the Eastern District of New York.

The Government claims that the decision in United States v. Novak, 443 F.3d 150 (2d Cir. 2006), supports the view that – so long as an indictment contains the phrase "and elsewhere" -- the indictment is not facially defective for failure to allege venue. Govt. Mem. at 51. But the government mischaracterizes the Novak decision. In Novak, the defendant argued that venue in the Eastern District of New York was improper because the conduct took place in the Southern

16

District.  The government "conceded that the Eastern District was not a proper venue for the charges." 443 F.3d at 160.  The issue for the Court was not whether venue was proper – it clearly was not – but whether the defendants had timely objected to venue.  Ironically, it was the Government that argued that the defendant's right to challenge venue was waived because the indictment alleged that the conduct occurred in the Eastern District and so revealed the "obvious" defect.  The court declined to find a waiver, however, given "the constitutional underpinnings and importance of proper venue."  The defendants' venue objection was found to be timely "and, as the Government concedes, meritorious" and the convictions were reversed for improper venue.

Here, as in <u>Novak</u>, the indictment alleges that the offense occurred in another venue.  The defect in the indictment is "obvious" and the count should be dismissed.

**B.     Because the Offense was Committed in the District of Columbia, Venue Does Not Lie in the Eastern District of New York**

The Government also points to the "substantial contacts" test in <u>United States v. Reed</u>, 773 F.2d 477 (2d Cir. 1985),[10] as if the presence of "substantial contacts" could, in and of itself, provide a basis for venue.[11]  In its references to the <u>Reed</u> decision, the Government fails to

---

[10]  <u>Reed</u> dealt very specifically with a perjury charge under 18 U.S.C § 1623. That provision prohibits false statements "in any proceeding before or ancillary to any court or grand jury of the United States." The court specifically focused on the question "whether perjury committed in an ancillary proceeding may be prosecuted in the district in which the parent proceeding is pending, as well as the in the district where the oath was taken."  The court looked not only to the particular language of the statute but also to the intent of Congress and found that "it intended venue in either district to be proper."  The court also emphasized that the witness was specifically advised, at the deposition, that he was giving testimony pursuant to the Southern District's local rules.  Venue was proper, therefore, in the jurisdiction in which the ancillary proceeding was pending.

[11]  Notably, application of that 'substantial contacts' test actually supports dismissal.  In each of the decisions relied on by the government, the courts emphasized that the testimony at issue related to events in the proposed venue, and caused harm in the proposed venue.  <u>Clark</u>, 1987 WL at *4 ("Clark testified to events that occurred here – his trading of stocks.  The effect of the alleged criminal conduct would be felt in this district."); <u>United States v. Manfredi</u>, 789 F.Supp. 961 at 962 (testimony was "ancillary to a proceeding in another district" because it was provided in an ongoing civil case that was pending in Indiana )  Here, the alleged perjury involved no act in the Eastern District of New York, but also the testimony did not relate to events in the Eastern District.  The

acknowledge the impact of the Supreme Court decision in United States v. Cabrales, 524 U.S. 1, 6-7 (1998), and the Second Circuit's subsequent discussions relating to Reed and the issue of substantial contacts.  As clarified in those decisions, the "substantial contacts" test does not create or confer venue; it is instead an additional analysis to ensure that a particular venue is consistent with Constitutional protections.

In United States v. Saavedra, 223 F.3d 85 (2d Cir. 2000), the Second Circuit reiterated the basic principles that govern the issue of venue:

> Venue ordinarily lies only in the state and district where the offense was committed. That rule, derived from two constitutional guarantees, is intended to afford an accused the protection of being tried in the place where he was physically present when the crime was committed.  Under it, venue appears to be well and wisely fixed.

Id. at 86.

The Second Circuit then acknowledged the Supreme Court's reiteration of those principles in United States v. Cabrales, 524 U.S. 1, 6-7 (1998).

> The Supreme Court, continuing the common law teaching, has ruled that where a cause of action arose – the 'locus delicti' of a charged offense – is 'determined from the nature of the crime alleged and the location of the act or acts constituting it.  For some criminal violations, the unitary character of the acts constituting the crime renders its locus delicti obvious.

The Second Circuit recognized, however, that those principles may not always resolve the issue of venue because "in today's wired world of telecommunication and technology, it is often difficult to determine exactly where a crime was committed."  *Id.*  Because the "locus delicti" in Saavedra was not obvious, the Second Circuit explained that the analysis of venue require a two step process.  First, because all of the relevant acts occurred in the Eastern District of New York, venue could lie in the Southern District only if the offense was a "continuing" one

---

testimony was taken in relation to an investigation of Spongetech, located in Manhattan.  The testimony involved events relating to Spongetech, none of which occurred in or related to the Eastern District of New York.  Under the

that would trigger the application of § 3237(a).  If the offense was found to be a continuing one, and venue could lie in the Eastern District, then the court would consider the issue of "substantial contacts" "to ensure that the policies and considerations underlying the Constitution's commands respecting venue have been preserved."  Id. at 89.

After engaging in a lengthy analysis, the court concluded that the charged offense was a 'continuing' one, that the racketeering element of the alleged offense was "an essential element" of the crime charged, and that the racketeering activity occurred in the Southern District.  Only by virtue of that careful analysis of the acts that constituted the crime did the court conclude that venue may be proper in the Southern District.

The Second Circuit then turned to the "substantial contacts" issue, not as a substitute for the venue analysis, but as an additional requirement designed to "determine whether the application of a venue provision in a given prosecution comports with constitutional safeguards."

The substantial contacts rule offers guidance on how to determine whether the location of venue is constitutional, especially in those cases where the defendant's acts did not take place within the district selected as the venue for trial.

Thus, contrary to the government's assertion, the issue of substantial contacts does not replace the traditional venue analysis.  It arises only where the 'locus delicti' is not clear from the commission of the acts, and the venue analysis would place the proceeding in a district other than the one in which the defendant acted.  The 'substantial contacts' test then serves to ensure that the proposed venue does not offend constitutional protections.

That same analysis was applied by the Second Circuit in the more recent decision in United States v. Tzolov, 642 F.3d 314 (2d Cir. 2010).  There, the defendant was accused of securities fraud and conspiracy.  On the substantive count of securities fraud, the Government

analysis employed by the Second Circuit, particularly in Tzolov, venue does not lie in the Eastern District even for the charge of securities fraud, much less for the even more remote offense of perjury.

argued that venue was proper in the Eastern District because the defendants traveled through JFK, and those flights were "an important part of furthering the fraudulent scheme."  The Second Circuit disagreed, finding that "no conduct that constituted the offense took place in the Eastern District" and venue was not proper.  *Id.*  at 319.  The venue analysis ended there, without reference to the issue of "substantial contacts."

The Tzolov court reached a different result with respect to the conspiracy count, finding that an overt act had occurred in the Eastern District.  *Id.* at 320.  Because it found venue on that conspiracy was proper, the court then proceeded to the issue of "substantial contacts," and the defendant's argument that his contact with the Eastern District did not "satisfy the substantial contacts test set forth in United States v. Reed."  The court again clarified that "though Reed refers to a substantial contacts test for determining venue, it is clear that the [court] regarded the locale of the defendant's acts as a sufficient basis for establishing venue."  The court emphasized that "virtually all the caselaw designates the site of the defendants acts as a proper venue," and that Reed "is helpful in determining whether a chosen venue is unfair or prejudicial to a defendant."  *Id.* at 321.  The court concluded that contracts were sufficient for venue to be proper on the conspiracy count.

The Government did locate and cite a decision, United States v. Clark, 1987 WL 13273 (S.D.N.Y. 1987), in which a district court appears to have found that venue was proper in the Southern District for a charge of perjury arising from testimony taken in Washington D.C. Citing the decision in Reed, and the "substantial contacts analysis," the Clark court found that "all factors point to this district as the proper venue."  *Id.* at *4.  That decision should not be

followed by this Courts.  Since it predates the Second Circuits' clarification of the decision Reed.[12]

Thus, the 'substantial contacts' test in <u>Reed</u> does not confer jurisdiction, it can only serve as a further constitutional check to determine whether the proposed venue "is unfair or prejudicial to a defendant."  This case, in contrast, presents a circumstance where the "locus delicti" is obvious: all of the acts alleged, and all those that constitute the crime, occurred in Washington D.C.

## CONCLUSION

For the foregoing reasons, and those stated in the initial motion to suppress, it is respectfully submitted that the Court should order suppression of all seized materials that the Government cannot now demonstrate are within the scope of the search warrants.

The defendant also requests that Count Nine of the Superseding Indictment be dismissed based on improper venue.

DATED:    New York, New York
          August 22, 2011

|  | HINSHAW & CULBERTSON LLP |
|---|---|
|  | By:  *s/Maranda E. Fritz* |
|  | Maranda E. Fritz |
|  | 780 Third Avenue, 4th Floor |
|  | New York, NY 10017 |
|  | Tel:  212-471-6200 |
|  | Fax: 212-935-1166 |

---

[12]  Notably, in the 20 years since the decision in <u>Clark</u> was issued, it has never been cited by any court.